IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALLEN MARGULIES et al.,

                  Plaintiffs,                3:13-cv-00475-PK

v.                                      OPINION AND ORDER

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT
OF OREGON,

                  Defendant.

PAPAK, Magistrate Judge:

      Plaintiffs, in their individual capacities and as class representatives, filed the instant

action against defendant Tri-County Metropolitan Transportation District of Oregon ("TriMet").

Plaintiffs allege that TriMet engages in a pattern or practice of failing to pay its bus and train

operators for all compensable work in violation of the federal Fair Labor Standards Act ("FLSA")

and Oregon law. Now before the court are TriMet's "Motion for Partial Summary Judgment as to

Page 1 - OPINION AND ORDER

Overtime Claims" ("motion for partial summary judgment") (#30) and plaintiffs' "Motion for

Approval of *Hoffmann-La Roche* Notice" ("*Hoffmann-La Roche* motion") (#19). For the reasons

discussed below, TriMet's motion for partial summary judgment is granted and plaintiffs'

*Hoffmann-La Roche* motion is granted in part and denied in part.

## PROCEDURAL BACKGROUND

On June 17, 2013, plaintiffs filed their second amended complaint (#18), alleging

violations of the FLSA and Oregon law. Specifically, plaintiffs allege that TriMet fails to pay

bus and train operators for: "(1) non-commute travel time between disparate start and end points

of operators' scheduled runs, (2) the differential between scheduled run times and actual run

times, (3) pre-departure time, (4) mandatory meetings with supervisors, (5) mandatory medical

examinations, and [(6)] any applicable overtime due for such compensable time." Second

Amended Complaint, #18, ¶ 4.

On July 3, 2013, plaintiffs filed the *Hoffmann-La Roche* motion.[1] On July 22, 2013,

TriMet filed a resistance (#26) to the *Hoffmann-La Roche* motion. On August 8, 2013, plaintiffs

filed a reply (#36).

On July 25, 2013, TriMet filed the motion for partial summary judgment. On August 19,

2013, plaintiffs filed a resistance (#37) to the motion for partial summary judgment. On

---

[1] Plaintiffs failed to comply with the Local Rules in several respects. First, plaintiffs combined their motion with their supporting memorandum. *See* LR 7-1(c) ("Every motion must be accompanied by a *separately* filed legal memorandum." (emphasis added)). Second, plaintiffs did not file each declaration in support of the motion as a separate document. *See* LR 10-3(a) ("Affidavits or declarations must be filed as separate documents with their own captions and footers."). Plaintiffs are reminded that they are required to comply with the Local Rules.

September 6, 2013, TriMet filed a reply (#39).[2]

On September 17, 2013, the court heard oral argument on plaintiffs' *Hoffmann-La Roche* motion and TriMet's motion for partial summary judgment. At the conclusion of the hearing, the parties stipulated to extend the time to supplement the record on the pending motions. On September 23, 2013, plaintiffs filed a corrected declaration of John Olsen (#43). On September 24, 2013, TriMet filed a supplemental memorandum in support of the motion for partial summary judgment (#45), as well as six additional declarations in support of the motion for partial summary judgment (#46 to #51). Plaintiffs' *Hoffmann-La Roche* motion and TriMet's motion for partial summary judgment are fully submitted and ready for decision.

## FACTUAL BACKGROUND

### A.    Parties

"TriMet is a regional transit provider in the Portland metropolitan area, with a service area of approximately 570 square miles, and supplies its passengers with commuter rail service (WES), bus service, and light rail service (MAX)." Declaration of Shelly Lomax ("Lomax Decl."), #32, ¶ 2. Named plaintiffs Allen Margulies, Stephen Fung, and Christopher Day are currently or were formerly employed as bus operators for TriMet. Declaration of Allen Margulies ("Margulies Decl."), #38, ¶ 2; Declaration of Stephen Fung ("Fung Decl."), #38, ¶ 2; Declaration of Christopher Day ("Day Decl."), #38, ¶ 2. Named plaintiff John Olsen is employed

---

[2] TriMet filed its reply one day late and did not request an extension of time. *See* LR 7-1(f) ("[A] party must file and serve any reply to the response within fourteen (14) days after service of the response."); LR 6 (providing an additional three days for service). Despite TriMet's untimely reply, I shall consider it.

as a train operator for TriMet.[3]  Corrected Declaration of John Olsen ("Olsen Decl."), #43, ¶ 2.

**B.    TriMet's Services**

TriMet employs 758 full-time bus operators and 319 part-time bus operators who provide

service for TriMet's 79 bus lines.  Lomax Decl., #32, ¶ 4; Ex. 1, Lomax Decl., #32-1, at 3.

TriMet also employs 153 full-time MAX rail operators who provide service for TriMet's four

light-rail lines.  Lomax Decl., #32, ¶ 4; Ex. 1, Lomax Decl., #32-1, at 2.

"TriMet bus routes are integrated with the MAX light rail system and make numerous

connections throughout the district with various MAX stations and stops, including the

Beaverton, Sunset, Rose Quarter, [and] Gateway Transit Centers, which then connect to the

Portland International Airport."  Lomax Decl., #32, ¶ 9.  Pursuant to an agreement with the Port

of Portland, TriMet is required to provide frequent light-rail service to the Portland International

Airport.  Ex. 3, Declaration of Gregory E. Skillman ("Skillman Decl."), #33-3, at 6.  Moreover,

various buses and light-rail trains provide service to the Portland Greyhound Bus Station, the

Portland AMTRAK Train Station, and the BOLT bus stop.  Lomax Decl., #32, ¶¶ 10-11.

**C.    Washington-Oregon Commuters**

Survey data suggests that a number of Washington residents commute to Oregon on a

regular basis and that such commuters regularly use the TriMet system.  For instance, a 2010

survey of people residing in Vancouver, Washington, and the surrounding communities found

that 41% of respondents commute to Oregon on a weekly basis.  Declaration of Drew Blevins,

#46, ¶¶ 2-4.  Of those respondents that commute to Oregon regularly, 15% ride a MAX light-rail

---

[3]  TriMet alleges that Olsen is currently a Streetcar operator, was a train operator from
December 11, 2011, to August 12, 2012, and was previously a bus operator.  Ex. 1, Declaration
of Gregory Skillman ("Skillman Decl."), #28-1, at 1.

train at least one day a week and 9% ride a TriMet bus at least one day a week.  *Id.* ¶ 6.

Furthermore, license-plate surveys of TriMet's Park and Ride lots suggest that

Washington residents regularly use TriMet services.  Declaration of Young Park ("Park Decl."),

#50, ¶ 5; *see also* Declaration of Jennifer Goodrich ("Goodrich Decl."), #48, ¶ 6 (noting that

TriMet's Park and Ride lots are designated for transit users only).  A 2006 license-plate survey

found that 71.8% of vehicles parked at the Park and Ride lot at the Expo Center had Washington

license plates; 76.2% of vehicles parked at the Park and Ride lot at Delta Park had Washington

license plates; 26.4% of vehicles parked at the Park and Ride lot at the Gateway Transit Center

had Washington license plates; and 77.5% of vehicles parked at the Park and Ride lot at the

Parkrose/Sumner Transit Center had Washington license plates.  Park Decl., #50, ¶ 6.  More

recent surveys show that Washington residents continue to use TriMet's Park and Ride lots.  For

instance, a September 18, 2013 survey of the Park and Ride lot at the Parkrose/Sumner Transit

Center found that, of the 165 vehicles parked in the lot, 117 had Washington license plates.

Goodrich Decl., #48, ¶ 6.  A September 20, 2013 survey of the Park and Ride lot at the Delta

Park/Vanport Transit Center found that, of the 148 vehicles parked in the lot, 113 had

Washington license plates.  Declaration of Joanna Panza ("Panza Decl."), #49, ¶ 6.

### D.    C-TRAN Ticketing Agreement

On September 1, 1991, TriMet entered into an agreement with the Clark County Public

Transportation Benefit Area Authority ("C-TRAN"), which provides transit services for

Vancouver and the surrounding communities.  Ex. 1, Declaration of Claire Potter ("Potter

Decl."), #41, at 1-8.  Pursuant to the agreement, TriMet accepts certain types of C-TRAN fares

on TriMet's system and C-TRAN accepts certain types of TriMet fares on C-TRAN's system.  *Id.*;

*see also* Ex. 2, Lomax Decl., #32-2, at 1 (listing the types of C-TRAN fares that are valid on

TriMet).  Under the agreement, "Vancouver, Washington area travelers holding a C-TRAN All-

Zone or Express fare can ride anywhere in the TriMet system." Lomax Decl., #32, ¶ 8.  TriMet

also agreed "to sell or provide space for C-TRAN to sell C-TRAN Adult passes to Clark County

residents at its downtown customer service office" and also agreed "to provide an option in its

employer-sponsored pass program for the sale of C-TRAN passes to Clark County residents."

Ex. 1, Potter Decl., #41, at 2.  The agreement further provides that C-TRAN shall pay TriMet

fifty cents per pass sold by TriMet's personnel at the downtown customer-service office and

"shall compensate [TriMet] for its net cost in providing service under [the] [a]greement." *Id.*

Until 2011, TriMet conducted annual surveys of bus and train passengers to determine

how many passengers used C-TRAN fare and, thus, how much C-TRAN would pay TriMet

under the agreement.  Second Declaration of Claire Potter ("Second Potter Decl."), #47, ¶¶ 2, 11.

A Fall 2008 Rider Survey found that, on any given work day of the week (Monday through

Friday), TriMet could expect 10,067 riders to use C-TRAN fares.  Second Potter Decl., #47, ¶ 7,

*citing* Ex. 2, Second Potter Decl., #47-1, at 1.  A Fall 2009 survey found that, for any given week

(including Saturdays and Sundays), TriMet could expect 38,912 riders to use C-TRAN fares.  *Id.*

¶ 8, *citing* Ex. 3, Second Potter Decl., #47-1, at 1.  Of those bus and rail passengers surveyed in

the Fall of 2009, 259 reported that they had transferred to or from a C-TRAN bus.  *Id.* ¶ 4.

"Due to the expense of conducting the TriMet Rider Survey it is no longer done annually,

and TriMet and C-TRAN agreed in 2011 that TriMet's compensation would be based on one-half

of the total revenue that C-TRAN collects from fares for its C-TRAN Express bus passes." *Id.* ¶

11.  Pursuant to this modified agreement, "C-TRAN paid TriMet $183,333.36 in 2011,

Page 6 - OPINION AND ORDER

$202,423.79 in 2012, and two payments totaling $135,571.05 to date in 2013, as compensation

for the C-TRAN All-Zone passes honored by TriMet." Potter Decl., #41, ¶ 6; *see also* Ex. 2,

Potter Decl., #41, at 1-5.

Although no longer required to determine its net cost under the C-TRAN ticketing

agreement, TriMet still conducts periodic, although not annual, Rider Surveys "[f]or budget,

planning and marketing purposes." Second Potter Decl., #47, ¶ 2. The most recent Rider Survey

was conducted in Fall 2012 and found that, for any given week (including Saturdays and

Sundays), TriMet could expect 11,891 riders to use C-TRAN fares. *Id.* ¶ 9, *citing* Ex. 4, Second

Potter Decl., #47-1, at 1. Of those bus and rail passengers surveyed in the Fall of 2012, 150

reported that they had transferred to or from a C-TRAN bus. *Id.* ¶ 5.

In September 2013, TriMet conducted a number of limited surveys aboard several C-

TRAN buses and at a Portland-area bus stop to determine the number of C-TRAN bus riders who

transfer to TriMet buses or trains. *See* Goodrich Decl., #48; Panza Decl., #49. On September 18,

2013, Joanna Panza, a paralegal/investigator with TriMet's Legal Services Department, rode the

C-TRAN #4 bus, with service from downtown Vancouver to Jantzen Beach in Portland. Panza

Decl., #49, ¶¶ 1-2. Panza interviewed eight passengers aboard the C-TRAN #4 bus. *Id.* ¶ 2. Of

the eight passengers, three intended to ride the C-TRAN #4 bus to a MAX light-rail station and

ride the train to their final destination. *Id.* ¶ 3. Another three passengers intended to ride the C-

TRAN #4 bus and then transfer to a TriMet bus to complete their trip. *Id.* The remaining two

passengers intended to ride the C-TRAN #4 bus to their final destination. *Id.* Of the eight

passengers Panza interviewed, four used C-TRAN passes, three used TriMet passes, and one

used a transfer. *Id.* In addition to those passengers she interviewed, Panza observed three

passengers exit the C-TRAN #4 bus at the Jantzen Beach stop in Portland and wait at a TriMet bus stop. *Id.*

Also on September 18, 2013, Panza rode the C-TRAN #4 bus from Vancouver to Delta Park in Portland. *Id.* ¶ 4. During her trip, Panza interviewed seven passengers. *Id.* Of those seven passengers, five intended to ride the C-TRAN #4 bus to a MAX light-rail station and ride the train to their final destination. *Id.* One passenger intended to ride the C-TRAN #4 bus and then transfer to a TriMet bus to complete his or her trip. *Id.* The remaining passenger intended to ride the C-TRAN #4 bus to his or her final destination. *Id.* Of the seven passengers Panza interviewed, five used C-TRAN passes and two used TriMet passes. *Id.* In addition to those passengers she interviewed, Panza observed three passengers exit the C-TRAN #4 bus at Jantzen Beach and board the TriMet #6 bus. *Id.*

On her return trip from Delta Park to Vancouver on the C-TRAN #4 bus, Panza interviewed another six passengers. *Id.* ¶ 5. Of those six passengers, two had taken a MAX light-rail train and then transferred to the C-TRAN #4 bus. *Id.* Four passengers had taken a TriMet bus, transferred to a MAX light-rail train, and then boarded the C-TRAN #4 bus. *Id.* Of the six passengers Panza interviewed, one used a C-TRAN pass, two used TriMet passes, and three used transfers. *Id.*

On September 20, 2013, Panza interviewed thirty-one individuals at the corner of SW 6th Street and SW Columbia Street in Portland. *Id.* ¶ 7. Of the thirty-one individuals she interviewed, fifteen were C-TRAN riders only, two were TriMet riders only, and fourteen had taken a TriMet bus and then transferred to a C-TRAN bus. *Id.* Twenty-four of the individuals were using C-TRAN passes, two were using TriMet passes, and five had Oregon Health and

Science University employee badges that allowed them to ride both TriMet and C-TRAN. *Id.*

Jennifer Goodrich, a legal assistant with TriMet's Legal Services Department, also conducted a series of surveys aboard C-TRAN buses. *See* Goodrich Decl., #48. On September 18, 2013, Goodrich interviewed fifteen passengers aboard the C-TRAN #65, with service from the Fisher's Landing Transit Center in Vancouver to the Parkrose/Sumner Transit Center in Portland. *Id.* ¶¶ 2-3. Of the fifteen passengers Goodrich interviewed, nine intended to continue their trip on a MAX light-rail train, five intended to continue their trip on a TriMet bus, and one passenger planned to ride the C-TRAN bus to his final destination. *Id.* ¶ 3. Twelve of the passengers used C-TRAN passes and indicated to Goodrich that they intended to use those passes to continue their trip in the TriMet system. *Id.* ¶ 4. Three of the passengers had TriMet passes. *Id.* At the Parkrose/Sumner Transit Center, Goodrich observed passengers exit the C-TRAN #65 bus and board TriMet buses. *Id.* ¶ 5.

Goodrich conducted another survey aboard the C-TRAN #164, which provides express service from the Fisher's Landing Transit Center in Vancouver to the TriMet transit mall on SW 5th Avenue in Portland. *Id.* ¶ 7. Of the thirty-seven passengers Goodrich interviewed, two intended to continue their trip on a TriMet bus using a transfer available from the C-TRAN bus operator and one passenger, who had a C-TRAN pass, intended to continue her trip on a MAX light-rail train. *Id.*

Despite the C-TRAN ticketing agreement, Plaintiff Margulies "never transported a passenger that used a C-TRAN fare media to ride [his] bus." Margulies Decl., #38, ¶ 7. Plaintiff Fung "transported a passenger that used a C-TRAN fare media about once a month." Fung Decl., #38, ¶ 7. Plaintiff Day "transported a passenger that used a C-TRAN fare media about once

every two months." Day Decl., #38, ¶ 7. Plaintiff Olsen "transported a passenger that used a C-TRAN fare media about once every two weeks." Olsen Decl., #38, ¶ 7.

## ANALYSIS

### I.   Motion for Partial Summary Judgment

In the motion for partial summary judgment, TriMet requests that the court grant summary judgment in TriMet's favor on the limited issue of whether TriMet's bus operators are exempt from the FLSA's overtime-pay provision. Specifically, TriMet argues that bus operators fall within the FLSA's motor-carrier exemption.[4]

### A.   Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530

---

[4] TriMet does not argue, however, that its train operators are subject to the motor-carrier exemption.

U.S. 133, 150 (2000); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990).

### B.    Discussion

#### 1.    Evidentiary objection

Before turning to consider the parties' substantive arguments, I first address plaintiffs'

request that I refuse to consider the C-TRAN ticketing agreement in deciding TriMet's motion.

Plaintiffs contend that the agreement should be excluded from consideration on the grounds that:

(1) the agreement TriMet attached to Gregory E. Skillman's declaration "does not appear to be

the current or complete agreement" and Skillman "does not attest that it is the current

agreement"; and (2) the agreement "was not disclosed in [TriMet's] initial disclosures, and

[TriMet] did not produce it until July 18, 2013, only 7 days before filing this motion for summary

judgment." Resistance to Motion for Partial Summary Judgment, #37, at 10 n.2.

I decline to grant plaintiffs' request. First, the agreement attached to Skillman's

declaration states that it automatically renews every two years. Ex. 1, Skillman Decl., #33-1, at

1. While Skillman did not specifically state in his declaration that the agreement is current,

Lomax references a current agreement in her declaration. *See* Lomax Decl., #32, ¶ 8 ("TriMet

has an intergovernmental agreement with [C-TRAN] . . . ."). Thus, it is reasonable to assume

that the agreement attached to Skillman's declaration is the current agreement. In any case, in

support of its reply brief, TriMet submitted an additional declaration from Claire Potter, in which

Potter attests that the agreement is still in effect, although it has been modified. Potter Decl.,

#41, ¶ 7. Moreover, although plaintiffs request that I refuse to consider the agreement itself,

plaintiffs do not dispute that TriMet accepts C-TRAN fares on TriMet's system. Indeed, each of

the named plaintiffs acknowledged that passengers could use C-TRAN fares on TriMet buses,

either because they personally had passengers that used such fare or because they knew of

passengers who purchased such fare to use in the TriMet system.  Margulies Decl., #38, ¶ 9;

Fung Decl., #38, ¶¶ 7-8; Day Decl., #38, ¶¶ 7-8; Olsen Decl., #38, ¶ 7.

Second, I decline to sanction TriMet under Federal Rule of Civil Procedure 37 by

excluding the agreement from consideration.  Under Federal Rule of Civil Procedure 26(a), "a

party must, without awaiting a discovery request, provide to the other parties . . . a copy . . . of all

documents . . . that the disclosing party has in its possession, custody, or control and may use to

support its claims or defenses." Fed. R. Civ. P. 26(a).  These initial disclosures are due at or

within fourteen days after the parties' Rule 26(f) conference.  *Id.*  Rule 37 provides that, "[i]f a

party fails to provide information . . . as required by Rule 26(a) . . . , the party is not allowed to

use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the

failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also R&R Sails,*

*Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1245-47 (9th Cir. 2012) (discussing Rule 37(c)(1)).

Plaintiffs argue that, because TriMet did not provide plaintiffs with a copy of the C-TRAN

ticketing agreement as required by Rule 26(a), the court should refuse to allow TriMet to use the

agreement in support of its motion for partial summary judgment.  For the reasons set forth in

TriMet's reply, I find such a sanction is not appropriate.  Specifically, I find TriMet's failure to

disclose the agreement earlier was harmless under the circumstances.  TriMet provided the

agreement to plaintiffs a week before filing the motion for partial summary judgment.  Moreover,

plaintiffs cannot claim that the existence of the agreement was a surprise.  As noted above, each

of the named plaintiffs indicated that they were aware C-TRAN fares were valid in the TriMet

system.  Thus, I find that exclusion of the agreement pursuant to Rule 37 is not appropriate.

Page 12 - OPINION AND ORDER

Accordingly, I overrule plaintiffs' evidentiary objection and shall now turn to consider the parties' substantive arguments.

### 2.    Applicability of motor-carrier exemption

"Under the FLSA, employers generally must pay their employees at least one and one-half times their regular rate of pay for hours worked in excess of 40 in a week." *Klem v. Cnty. of Santa Clara, Cal.*, 208 F.3d 1085, 1089 (9th Cir. 2000), *citing* 29 U.S.C. § 207(a)(1). The FLSA, however, exempts certain classes of employees from its overtime-pay provision. *See* 29 U.S.C. § 213(b). For instance, under the motor-carrier exemption, the FLSA exempts "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1).

"The [motor-carrier] exemption is construed narrowly and the employer seeking the exemption has the burden of proving entitlement." *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1468 (9th Cir. 1997) (citations omitted); *accord Reich v. Am. Driver Serv., Inc.*, 33 F.3d 1153, 1156 (9th Cir. 1994); *see also Klem*, 208 F.3d at 1089 (noting that courts should construe FLSA exemptions narrowly). "'To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretive process and to frustrate the announced will of the people.'" *Reich*, 33 F.3d at 1156, *quoting Donovan v. Nekton, Inc.*, 703 F.2d 1148, 1151 (9th Cir. 1983).

In determining the applicability of the motor-carrier exemption, courts are guided by 29 C.F.R. § 782.2(a), which provides:

> The power of the Secretary of Transportation to establish

maximum hours and qualifications of service of employees, on
which exemption depends, extends to those classes of employees
and those only who: (1) Are employed by carriers whose
transportation of passengers or property by motor vehicle is subject
to his jurisdiction under section 204 of the Motor Carrier Act, and
(2) engage in activities of a character directly affecting the safety of
operation of motor vehicles in the transportation on the public
highways of passengers or property in interstate or foreign
commerce within the meaning of the Motor Carrier Act.

29 C.F.R. § 782.2(a) (citations omitted). In other words, an employer must show two things to

establish that an employee is subject to the motor-carrier exemption—first, that the employer

itself is subject to the jurisdiction of the Secretary of Transportation and, second, that "'the

employee's business-related activities . . . directly affect the safety of operation of motor vehicles

in the transportation on the public highways of passengers or property in interstate or foreign

commerce within the meaning of the Motor Carrier Act." *Abel v. S. Shuttle Servs., Inc.*, 631 F.3d

1210, 1213 (11th Cir. 2011) (per curiam), *quoting Walters v. Am. Coach Lines of Miami, Inc.*,

575 F.3d 1221, 1227 (11th Cir. 2009). I shall examine each of these requirements in turn.

      a.      **Is TriMet subject to the jurisdiction of the Secretary of
Transportation?**

Title 49, United States Code, Section 13501 provides that the Secretary of Transportation

has jurisdiction over transportation by a motor carrier:

    (1)    between a place in—

        (A)    a State and a place in another State;

        (B)    a State and another place in the same State through
another State;

        (C)    the United States and a place in a territory or
possession of the United States to the extent the
transportation is in the United States;

> (D)    the United States and another place in the United
>          States through a foreign country to the extent the
>          transportation is in the United States; or
>
> (E)    the United States and a place in a foreign country to
>          the extent the transportation is in the United States;
>          and
>
> (2)    in a reservation under the exclusive jurisdiction of the
>          United States or on a public highway.

49 U.S.C. § 13501. Thus, under the statute's plain language, the Secretary of Transportation does

not have jurisdiction overly wholly intrastate transportation. *Reich*, 33 F.3d at 1155.

Nevertheless, courts have found that, under certain circumstances, wholly intrastate

transportation is subject to the Secretary of Transportation's jurisdiction under 49 U.S.C.

§ 13501. Specifically, when "wholly intrastate commerce is merely part of a 'continuing

transportation' in interstate or foreign commerce, . . . the motor carrier is subject to the Secretary

of Transportation's jurisdiction." *Id.* at 1155 n.3, *citing Burlington N., Inc. v. Weyerhaeuser Co.*,

719 F.2d 304, 309-10 (9th Cir. 1983); *see also Walling v. Jacksonville Paper Co.*, 317 U.S. 564,

568 (1943) (finding that, where goods were transported from out of state, temporarily housed in a

warehouse, and then transported intrastate to the customer, the goods were in interstate

commerce until they reached their final destination because there was a "practical continuity of

movement of the goods").

Here, there is no question that none of TriMet's buses or trains cross state lines. Thus, to

fall within the Secretary of Transportation's jurisdiction, TriMet must show that its wholly

intrastate transportation of passengers "is merely part of a 'continuing transportation' in interstate

or foreign commerce." *Reich*, 33 F.3d at 1155 n.3. TriMet contends that this requirement is

satisfied in three ways: (1) many of its buses and light-rain trains provide service to the Portland

AMTRAK Train Station, the Portland International Airport, the Greyhound Bus Station, and the

BOLT bus stop; (2) it has an agreement with the Port of Portland requiring it to provide frequent

light-rail service to the Portland International Airport; and (3) it has a through-ticketing

agreement with C-TRAN.

    First, I am unpersuaded that TriMet's service to the AMTRAK Train Station, the

Greyhound Bus Station, and the BOLT bus stop is sufficient to bring TriMet under the

jurisdiction of the Secretary of Transportation.  I find *United States v. Yellow Cab Co.*, 332 U.S.

218 (1947), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467

U.S. 752 (1984), instructive.  In *Yellow Cab*, the United States Supreme Court addressed the

meaning of "interstate commerce" under the Sherman Act in the context of taxicabs in Chicago.

*Id.*  In doing so, the Court first held that a taxicab transported passengers in interstate commerce

where the taxicab, pursuant to an agreement with a railroad company, transported passengers

from one railroad station to another so that passengers could continue on their interstate journey:

> [It is a] well-known fact that Chicago is the terminus of a large
> number of railroads engaged in interstate passenger traffic and that
> a great majority of the persons making interstate railroad trips
> which carry them through Chicago must disembark from a train at
> one railroad station, travel from that station to another some two
> blocks to two miles distant, and board another train at the latter
> station.  The railroads often contract with the passengers to supply
> between-station transportation in Chicago. [A taxicab company]
> then contracts with the railroads and the railroad terminal
> associations to provide this transportation by special cabs . . . .
>
>     The transportation of such passengers and their luggage
> between stations in Chicago is clearly a part of the stream of
> interstate commerce.  When persons or goods move from a point of
> origin in one state to a point of destination in another, the fact that

> a part of that journey consists of transportation by an independent
> agency solely within the boundaries of one state does not make that
> portion of the trip any less interstate in character.

*Id.* at 228.  The Court, however, held that a taxicab's transportation of passengers from a railroad

station to "homes, offices and hotels in Chicago" was "too unrelated to interstate commerce to

constitute a part thereof within the meaning of the Sherman Act." *Id.* at 230.  The Court

explained:

> These taxicabs, in transporting passengers and their luggage to and
> from Chicago railroad stations, admittedly cross no state lines; by
> ordinance, their service is confined to transportation "between any
> two points within the corporate limits of the City."  None of them
> serves only railroad passengers, all of them being required to serve
> "every person" within the limits of Chicago. *They have no
> contractual or other arrangement with the interstate railroads.*
> Nor are their fares paid or collected as part of the railroad fares.  In
> short, their relationship to interstate transit is only casual and
> incidental.
>
> . . . .
>
> Here we believe that the common understanding is that a
> traveler intending to make an interstate rail journey begins his
> interstate movement when he boards the train at the station and that
> his journey ends when he disembarks at the station in the city of
> destination.  What happens prior or subsequent to that rail journey,
> at least in the absence of some special arrangement, is not a
> constituent part of the interstate movement.

*Id.* at 230-32 (emphasis added).

In this case, TriMet's transportation of passengers to or from the AMTRAK Train Station,

the Greyhound Bus Station, and the BOLT bus stop bears only a "casual and incidental," *id.* at

231, relationship to interstate transit.  TriMet's service to the AMTRAK Train Station, the

Greyhound Bus Station, and the BOLT bus stop is not part of any contractual arrangement with

Page 17 - OPINION AND ORDER

those interstate carriers. The fact that some of TriMet's passengers boarding or disembarking at those bus and train stops might travel to or from another state is insufficient to transform TriMet's wholly intrastate transit services into interstate transit services. *See also Packard v. Pittsburgh Transp. Co.*, 418 F.3d 246, 258 (3d Cir. 2005) (applying *Yellow Cab* and concluding that a bus company's wholly intrastate service to the airport did not bring the bus company within the jurisdiction of the Secretary of Transportation because the services were "not arranged as part of [the] passengers' interstate travels through a pre-packaged tour, or linked in any other way"); *Gilmer v. Alameda-Contra Costa Transit Dist.*, No. C 08-05186 CW, 2010 WL 289299, at *12 (N.D. Cal. Jan. 15, 2010) ("[T]he fact that [bus] drivers may pick up and drop off passengers at the Port of Oakland and the Oakland International Airport is irrelevant absent the presence of a 'through-ticketing' arrangement with an interstate carrier.").

Second, although a closer call, I am similarly unpersuaded that TriMet's service to the Portland International Airport is sufficient to bring TriMet under the Secretary of Transportation's jurisdiction. Although TriMet has an agreement with the Port of Portland requiring frequent light-rail service to the Portland International Airport, TriMet has presented no evidence that passengers disembarking from flights at the airport have prearranged to continue their travels on TriMet's light-rail service. A traveler going to or from the Portland International Airport "has complete freedom to arrive at or leave the station by taxicab, . . . bus, [light-rail train], . . . private automobile, his own two legs, or various other means of conveyance. . . . From the standpoints of time and continuity, the [light-rail] trip may be quite distinct and separate from the interstate journey." *Yellow Cab*, 332 U.S. at 232.

The only other evidence that TriMet is engaging in interstate transportation is the C-

TRAN ticketing agreement. Pursuant to the agreement, certain C-TRAN fares are valid on TriMet services and certain TriMet fares are valid on C-TRAN services. Ex. 1, Potter Decl., #41, at 1-8; *see also* Ex. 2, Lomax Decl., #32-2, at 1 (listing the types of C-TRAN fares that are valid on TriMet). A Fall 2012 Rider Survey found that, in any given week, 11,891 TriMet riders use C-TRAN fare. Second Potter Decl., #47, ¶ 9. Of those surveyed, 150 reported that they transferred to or from a C-TRAN bus. *Id.* ¶ 5. Moreover, anecdotal evidence suggests that Washington residents regularly use C-TRAN fare to originate their interstate trip on a C-TRAN bus and continue to their final destination on a TriMet bus or train. *See* Goodrich Decl., #48, ¶¶ 2-5, 7 (describing limited surveys aboard C-TRAN buses); Panza Decl., #49, ¶¶ 2-5, 7 (same).

In light of this evidence, I agree with TriMet that, because TriMet offers a means of "practical continuity of movement," *Walling*, 317 U.S. at 568, between Washington and Oregon by virtue of its ticketing arrangement with C-TRAN, it is engaged in the interstate transportation of passengers. Courts have often recognized that the Secretary of Transportation has jurisdiction over an intrastate carrier that has a through-ticketing arrangement with an interstate carrier. *See Abel*, 631 F.3d at 1214 n.5 (noting that "a number of agency determinations and some lower court decisions[ have found] that the Secretary of Transportation has jurisdiction over an entity making intrastate passenger-carrying trips . . . where there is a 'contractual connection' between the intrastate carrier and an interstate carrier for the 'continuous passage' of the passengers" (citation omitted)); *United Transp. Union Local 759 v. Orange Newark Elizabeth Bus, Inc.*, 111 F. Supp. 2d 514, 520 (D.N.J. 2000) (finding that a bus company was subject to the jurisdiction of the Secretary of Transportation because it "participates in a typical through ticketing arrangement because it accepts the New Jersey Transit Interstate Bus Pass, which entitles to the passenger to

bus transportation in New Jersey and between New Jersey and New York"); *cf. Yellow Cab Co.*,

332 U.S. at 232 (holding that a taxicab is not engaged in interstate commerce when it transports a

passenger from a rail station, "at least in the absence of some special arrangement"). Indeed,

plaintiffs conceded at oral argument that, because of the C-TRAN ticketing arrangement, TriMet

is engaged in the interstate transportation of passengers. Accordingly, I find that TriMet has

satisfied the first requirement for application of the motor-carrier exemption—that is, TriMet has

established that it is subject to the jurisdiction of the Secretary of Transportation.

> **b.    Are TriMet bus operators engaged in an activity that directly affects the safety of operation of a motor carrier in the interstate or foreign transportation of persons or property?**

Next, under the second requirement for application of the motor-carrier exemption,

TriMet must establish that its bus operators "engage in activities of a character directly affecting

the safety of operation of motor vehicles in the transportation on the public highways of

passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier

Act." 29 C.F.R. § 782.2(a). It is undisputed that drivers directly affect the safety of operation of

motor vehicles. *See* 29 C.F.R. § 782.2(b)(1). Thus, the issue here is whether TriMet bus

operators are engaged in the interstate transportation of passengers.

As a preliminary matter, I find it appropriate to distinguish this second requirement from

the requirement that TriMet be subject to the jurisdiction of the Secretary of Transportation. The

fact that TriMet transports interstate passengers does not necessarily mean that the Secretary of

Transportation has the power to establish qualifications and maximum hours of service for all of

TriMet's employees. The Supreme Court has recognized that a single employer may have

employees that are subject to the motor-carrier exemption while others are not. *See, e.g., United*

*States v. Am. Trucking Ass'ns*, 310 U.S. 534, 552 (1940); *see also Garcia v. Pace Suburban Bus Serv.*, 955 F. Supp. 75, 77 (N.D. Ill. 1996) (noting that, even if an employer is subject to the jurisdiction of the Secretary of Transportation, "[t]hat does not mean . . . that the Secretary of Transportation has automatic jurisdiction over all drivers of [the] interstate carrier").

In determining whether a particular employee is engaged in the interstate transportation of persons or property for purposes of the motor-carrier exemption, the court need not find that the employee routinely crosses state lines or otherwise participates in the interstate transportation of goods or passengers. Rather, the relevant inquiry is whether the employee is likely to be "called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities" in the interstate transportation of goods or passengers. 29 U.S.C. § 782.2(b)(3); *see also Resch v. Krapf's Coaches, Inc.*, Civil Action No. 11-6893, 2013 WL 4603011, at *6 (E.D. Pa. Aug. 29, 2013) ("[D]efendant does not need to prove that each plaintiff drove interstate regularly, or even that they have driven interstate at all; instead, defendant must simply prove that 'because of company policy and activity, the driver could *reasonably* be expected to do interstate driving.'"), *quoting Friedrich v. U.S. Computer Servs.*, 974 F.2d 409, 417 (3d Cir. 1992); *Garcia*, 955 F. Supp. at 77 ("[J]urisdiction extends only to drivers who reasonably could be expected to make one of the carrier's interstate runs, and that means more than a remote possibility."), *citing Reich*, 33 F.3d at 1156 & n.4. "[I]f a carrier is engaged in interstate work and assigns drivers randomly to that driving, all of its drivers are considered subject to the Motor Carrier Act." *Sturm v. CB Transp., Inc.*, Case No. 1:12-cv-109-CWD, 2013 WL 1867075, at *8 (D. Idaho May 2, 2013).

In this case, TriMet argues that, because of the C-TRAN ticketing arrangement, "it is

Page 21 - OPINION AND ORDER

reasonably likely that any TriMet bus operator may be carrying a passenger (whether a Washington resident or Oregon resident) who is using a single ticket to ride TriMet and/or C-TRAN as part of the passenger's interstate travel." Supplemental Memorandum in Support of Motion for Partial Summary Judgment, #45, at 6. Plaintiffs respond that TriMet has produced insufficient evidence that *each* bus operator transports interstate passengers. Plaintiffs also contend that, under the Ninth Circuit's analysis in *Reich*, the motor-carrier exemption only applies for four months from the date that a bus operator transports an interstate passenger or is subject to transporting an interstate passenger and, thus, TriMet is required to show "the duration of the applicability of the [motor-carrier] exemption" for each driver. Resistance to Motion for Partial Summary Judgment, #37, at 15 (emphasis omitted). Finally, plaintiffs argue that, to the extent any bus operator transported interstate passengers, TriMet has failed to show that such operator "participated in more than a *de minimis* level of interstate activity." *Id.* at 17.

This second requirement for application of the motor-carrier exemption presents a much closer question than the first. Much of the evidence TriMet relies on does little to prove that each bus operator could reasonably be expected to engage in the interstate transportation of passengers. For instance, TriMet cites to its periodic Rider Surveys, the most recent of which found that, in any given week, TriMet can expect 11,891 riders to use a C-TRAN fare and further found that, of all the respondents, 150 had transferred to or from a C-TRAN bus. Second Potter Decl., #47, ¶¶ 5, 9. While this evidence is certainly relevant to whether TriMet is subject to the jurisdiction of the Secretary of Transportation, it fails to distinguish between passengers on light-rail trains and passengers on buses. TriMet's reliance on license-plate surveys of its Park and Ride lots is similarly problematic. Such surveys do not reveal how many riders used TriMet's

light-rail service versus its bus service.[5]

The September 2013 surveys conducted by Jennifer Goodrich and Joanna Panza, on the other hand, do distinguish between light-rail and bus riders. For example, on September 18, 2013, Goodrich interviewed fifteen passengers aboard the C-TRAN #65 bus. Goodrich Decl., #48, ¶¶ 2-3. Five of the passengers reported that "they planned to continue their trip by boarding a TriMet bus" using either a C-TRAN or TriMet pass. *Id.* ¶¶ 3-4. Panza reported similar results from the interviews she conducted. *See* Panza Decl., #49, ¶¶ 2-5, 7. While these were isolated surveys and I am hesitant to conclude that the results are representative of the total TriMet-passenger population, they nevertheless illustrate that the C-TRAN ticketing arrangement "functions just as the two transit systems intended it." Supplemental Memorandum in Support of Motion for Partial Summary Judgment, #45, at 6. That is, there is evidence of actual interstate riders transferring from a C-TRAN bus to a TriMet bus using either a C-TRAN or TriMet pass.

While the September 2013 surveys tend to show that some bus operators are engaged in the interstate transportation of passengers, TriMet must establish the applicability of the motor-carrier exemption on a driver-by-driver basis. Although this is a close question, I find that TriMet has satisfied its burden of showing that each bus operator could reasonably be expected to transport interstate passengers. While there may be more interstate-passenger traffic on some bus routes rather than others, TriMet's agreement with C-TRAN permits interstate passengers to go anywhere within the TriMet system using certain types of C-TRAN fare or TriMet fare and, thus,

---

[5] Beyond the fact that such surveys do not distinguish between light-rail and bus passengers, TriMet cites to no authority suggesting that a bus operator transporting an out-of-state resident who parks in a Park and Ride lot is subject to the Secretary of Transportation's jurisdiction.

each bus operator could be called upon in his or her ordinary course of work to transport an interstate passenger. Moreover, under TriMet's bus operators' collective-bargaining agreement, bus operators "have a contract right to bid for different work assignments every three months, based on seniority and their qualifications." Declaration of Hayden Talbot ("Talbot Decl."), #27, ¶ 7. Thus, bus operators can have a variety of bus routes over the course of a year, some of which may be more likely to carry interstate passengers.

I find plaintiffs' arguments unavailing. Plaintiffs' reliance on the Ninth Circuit's analysis in *Reich* is misplaced. In *Reich*, the Ninth Circuit addressed whether the motor-carrier exemption applies where, because of the nature of the employer's business, employees only drive out-of-state during certain times of the year. *Reich*, 33 F.3d at 1154. The Ninth Circuit held that the employer must present "some concrete evidence such as an actual trip in interstate commerce" and that such evidence "should be accepted as proof that the driver is subject to [the jurisdiction of the Secretary of Transportation] for a 4-month period from the date of the proof." *Id.* at 1156-57 (emphasis omitted) (citation omitted). In this case, however, TriMet's bus operators do not engage in the transportation of interstate passengers during only certain times of the year. Rather, bus operators may be called upon at any time to transport interstate passengers by virtue of the C-TRAN ticketing arrangement. Accordingly, *Reich*'s analysis is not applicable.

I am likewise unpersuaded by plaintiffs' argument that bus operators' participation in interstate commerce is *de minimis*. As the United States District Court for the District of New Jersey explained:

> "It is the character of the activities rather than the proportion of
> either the employee's time or his activities that determines the
> actual need for the [Department of Transportation's] power to

Page 24 - OPINION AND ORDER

> establish reasonable requirements with respect to qualifications,
> maximum hours of service, safety of operation and equipment."
> Therefore, even if ONE Bus drivers only transport a very small
> number of passengers engaging in interstate transportation, . . .
> those drivers are engaged in interstate transportation.

*United Transp.*, 111 F. Supp. 2d at 520, *quoting Levinson v. Spector Motor Serv.*, 330 U.S. 649,

674-75 (1947); *see also Lucas v. Bell Trans*, 773 F. Supp. 2d 930, 936 (D. Nev. 2011)

("[A]lthough a defendant must show more than a *de minimis* interstate commerce nexus, this is

measured by no fixed percentage, but according to the character of the employee's activities.").

Here, given that TriMet's bus operators could be expected to transport an interstate passenger at

any time, I find that such operators' involvement in interstate commerce cannot be characterized

as *de minimis*.

Thus, in light of the foregoing, TriMet has established that it is subject to the jurisdiction

of the Secretary of Transportation and that its bus operators engage in activities that directly

affect the safety of operation of motor carriers in the interstate transportation of passengers.

Accordingly, I find that the motor-carrier exemption applies and that TriMet is entitled to

summary judgment on all plaintiff-bus operators' FLSA claims for overtime pay.

## II.    *Hoffmann-La Roche* **Motion**

In the *Hoffmann-La Roche* motion, plaintiffs request that the court: (1) conditionally

certify the action as a representative collective action under 29 U.S.C. § 216(b); (2) equitably toll

the statute of limitations for opt-in plaintiffs; (3) approve the proposed notice attached to

plaintiffs' motion, including the ninety-day cutoff for potential plaintiffs to mail their consent-to-

join forms; (4) authorize plaintiffs to mail, email, and post notice of the action; and (5) order

TriMet to produce the names, mailing addresses, email addresses, and telephone numbers of all

potential collective-action members.

### A.    Conditional Certification

First, plaintiffs request that the court "conditionally certify this action as a representative collection action," *Hoffmann La-Roche* Motion, #19, at 1, and authorize plaintiffs to send notice of the action to all prospective collective-action members, defined as "all individuals who are currently employed, or formerly have been employed, by [TriMet] as a bus or train operator or in an equivalent position at any time on or after January 22, 2010." Proposed Order Granting *Hoffmann-La Roche* Motion, #19, at 2.

An employee may bring an action alleging a FLSA violation on behalf of herself and "other employees similarly situated." 29 U.S.C. § 216(b); *see also Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1064 (9th Cir. 2000) (discussing collective actions under the FLSA). Members of a FLSA collective action must "opt in" to the action; that is, unless a prospective collective-action member consents to join the action, he or she is not bound by the judgment and may bring his or her own independent action. 29 U.S.C. § 216(b); *Busk v. Integrity Staffing Solutions, Inc.*, 713 F.3d 525, 528 (9th Cir. 2013) ("Under FLSA, a potential plaintiff does not benefit from (and is not bound by) a judgment unless he or she affirmatively opts in to the lawsuit." (citation omitted) (internal quotation marks omitted)). This distinguishes FLSA collective actions from class actions under Federal Rule of Civil Procedure 23, which requires class members to opt out or be bound by the result of the action. *Busk*, 713 F.3d at 528 (comparing a FSLA collective action to a Rule 23 class action); *McElmurry v. U.S. Bank Nat'l Ass'n*, 495 F.3d 1136, 1139 (9th Cir. 2007) (same). In a FLSA collective action, "[t]he plaintiffs bear the burden of showing that the representative plaintiffs and proposed collective action group

Page 26 - OPINION AND ORDER

are 'similarly situated.'" *Valladon v. City of Oakland*, No. C 06-07478 SI, 2009 WL 2591346, at *7 (N.D. Cal. Aug. 21, 2009).

In *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989), the United States Supreme Court held that districts courts have the discretion to facilitate the process of notifying potential collective-action members. *Id.* at 171 ("[I]t lies within the discretion of a district court to begin its involvement early, at the point of the initial notice, rather than at some later time."); *see also Does I thru XXIII*, 214 F.3d at 1064 (discussing *Hoffmann-La Roche*). In appropriate cases, a district court may: (1) authorize the named plaintiffs to send notice to prospective collective-action members; (2) settle disputes about the content of the notice; and (3) set deadlines by which opt-in plaintiffs must file their consent-to-join forms. *Hoffmann-La Roche*, 493 U.S. at 171-72. A district court's involvement in the notification process can "ensure that [notice] is timely, accurate, and informative" and, moreover, "serves the legitimate goal of avoiding multiplicity of duplicative suits and setting cutoff dates to expedite the disposition of the action." *Id.* at 172.

Neither the Supreme Court nor the Ninth Circuit have articulated a standard for determining when a district court should exercise its discretion to become involved in the notification process; however, many district courts have employed a two-step process for designating a collective action under the FLSA. *See Brown v. Citicorp Credit Servs., Inc.*, No. 1:12-cv-00062-BLW, 2013 WL 4648546, at *1 (D. Idaho Aug. 29, 2013) ("The Ninth Circuit has not articulated a single standard to guide this inquiry, but a majority of courts adopt a two-step approach."); *see also Thiessen v. Gen. Electric Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001) (finding that the district court did not err in adopting the two-step approach); *Carrillo v. Schneider Logistics, Inc.*, No. CV 11-8557 CAS (DTBx), 2012 WL 556309, at *10 (C.D. Cal.

Jan. 31, 2012) (using the two-step process).  Under the first step, the district court preliminarily

determines whether the prospective collective-action members are "similarly situated" to the

named plaintiff. *Thiessen*, 267 F.3d at 1102; *Brown*, 2013 WL 4648546, at *1.  At this stage, the

court employs a lenient standard "that typically results in certification." *Carrillo*, 2012 WL

556309, at *10 (citation omitted) (internal quotation mark omitted); *see also Brown*, 2013 WL

4648546, at *1 (noting that plaintiffs bear a "minimal" burden at this stage).  The named plaintiff

need only produce "substantial allegations that the putative class members were together victims

of a single decision, policy, or plan." *Thiessen*, 267 F.3d at 1102 (citation omitted) (internal

quotation marks omitted).  If the court determines that the named plaintiff has made a sufficient

showing, it "conditionally authorizes the case as a collective action and orders notice

disseminated to potential class members, allowing them to opt in by filing a written consent."

*Carrillo*, 2012 WL 556309, at *10.  Under the second step, the district court applies a more

stringent standard to determine whether the case should proceed to trial as a collective action.

*Thiessen*, 267 F.3d at 1102-03; *Brown*, 2013 WL 4648546, at *1; *Carrillo*, 2012 WL 556309, at

*10.

     In this case, TriMet argues that the court should decline to exercise its discretion to

become involved in the notification process because plaintiffs have not made a sufficient

showing that the proposed collective-action members are "similarly situated" to the named

plaintiffs.  TriMet notes that it "currently employs 758 regular full-time bus operators and 319

part-time bus operators" who service over 70 bus routes. Resistance to *Hoffmann-La Roche*

Motion, #26, at 4, *citing* Talbot Decl., #27, ¶ 2. TriMet states that these bus operators have a

wide variety of work assignments—some have split-shifts, while others do not; some serve as

Page 28 - OPINION AND ORDER

"extra board," "regular relief," and "vacation relief" operators; and some are part-time ("Mini-

Run") operators. *Id.* at 5, *citing* Talbot Decl., #27, ¶¶ 2-6. Moreover, TriMet states that it

employs 153 full-time train operators, who "collectively drive ninety-one (91) scheduled run

assignments on the four MAX train lines each day." *Id.* at 6, *citing* Talbot Decl., #27, ¶ 8.

Finally, TriMet notes that all of its unionized employees "have a contract right to bid for different

work assignments every three months" and, thus, a bus or train operator may have as many as

four different work assignments each year. *Id.* at 5-6, *citing* Talbot Decl., #27, ¶¶ 7, 9. In light

of this wide variety of work assignments, TriMet argues that plaintiffs have failed to demonstrate

that all current and former bus and train operators are "similarly situated."

      I disagree with TriMet and find that conditional certification is appropriate. Plaintiffs

have adequately alleged that TriMet bus and train operators are victims of a single policy or

practice to not pay such operators for all compensable time. Plaintiffs have identified five

categories of unpaid time. Ten bus operators and one train operator have submitted declarations

indicating that, during the relevant time period, TriMet failed to pay them for several, and in

most cases all, of those categories of time. *See* Declaration of Thomas Hall, #20; Declaration of

John Jamison, #20; Declaration of Jeffrey Fischer, #20; Declaration of Jack Phillips, #20;

Declaration of Samantha Arthur, #20; Declaration of Allen Margulies, #20; Declaration of

Christopher Day, #20; Declaration of Paul Keppler, Jr., #20; Declaration of Stephen Fung, #20;

Declaration of Wesley Krinker, #20; Olsen Decl., #43. That a bus or train operator might not

have claims under each category does not automatically render this case unsuitable to proceed as

a collective action. *See Valladon*, 2009 WL 2591346, at *7 (finding that, under the second, more

stringent step of the two-step approach, certification was appropriate where the plaintiffs, police

officers with the City of Oakland, alleged that the City of Oakland failed to pay them for various categories of compensable time and where each plaintiff did not necessarily have a claim under each category).

In light of the foregoing, I find that plaintiffs have satisfied their minimal burden of showing that all current and former bus and train operators employed with TriMet as of January 22, 2010, are similarly situated to the named plaintiffs.  Accordingly, I shall grant plaintiffs' request that I conditionally certify the case as a FLSA collective action and I shall authorize plaintiffs' to send notice of the action to all prospective collective-action members.

**B.    Equitable Tolling**

The FLSA provides for a two-year statute of limitations for FLSA violations, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a).  In a collective action, the action is not "commenced" for opt-in plaintiffs until his or her "written consent [to join the action] is filed in the court in which the action was commenced." 29 U.S.C. § 256(b).  In this case, plaintiffs request that the court

> equitably toll the statute of limitations as of the date when the original complaint was filed, *i.e.*, January 22, 2013, or as of the date when [p]laintiffs' counsel requested that [TriMet] provide class member contact information or agree to a tolling agreement, *i.e.*, April 5, 2013, through the date of the Court-set deadline for receipt of Consents to Join.

*Hoffmann-La Roche* Motion, #19, at 18.  Plaintiffs contend that equitable tolling of the statute of limitations is appropriate in this case because plaintiffs' counsel asked TriMet to voluntarily produce contact information for prospective collective-action members and to agree to tolling

Page 30 - OPINION AND ORDER

and TriMet refused both requests.

"Equitable tolling applies when the plaintiff is prevented from asserting a claim by wrongful conduct on the part of the defendant, or when extraordinary circumstances beyond the plaintiff's control made it impossible to file a claim on time." *Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999).[6] I have found no Ninth Circuit case addressing whether, in the context of a FLSA collective-action, a defendant's refusal to provide contact information for potential plaintiffs is a sufficient reason to equitably toll the statute of limitations. The district courts are split on the issue. *See Ribot*, 2013 WL 3778784, at *16 (noting that there is "mixed authority" on the issue); *Rose v. Wildflower Bread Co.*, No. CV09-1348-PHX-JAT, 2011 WL 208044, at *2 (D. Ariz. Jan. 20, 2011) ("The Ninth Circuit has not considered, and district courts appear to be split on, whether refusal to provide contact information for potential class members is grounds for equitable tolling."). *Compare, e.g., Adedapoidle-Tyehimba v. Crunch, LLC*, Case No. 13-cv-

---

[6] In *Stallcop v. Kaiser Foundation Hospitals*, 820 F.2d 1044 (9th Cir. 1987), the Ninth Circuit stated that there "are two types of equitable modification, equitable tolling and equitable estoppel. Equitable tolling requires that [a plaintiff] was excusably ignorant of the limitations period. . . . Equitable estoppel focuses on the defendant's actions." *Id.* at 1050; *see also Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000) ("Equitable estoppel focuses primarily on the actions taken by the defendant in preventing a plaintiff from filing suit, whereas equitable tolling focuses on the plaintiff's excusable ignorance of the limitations period and on lack of prejudice to the defendant."), *abrogated on other grounds by Socop-Gonzalez v. INS*, 272 F.3d 1176 (9th Cir. 2001). Some district-court cases, however, have combined these two equitable remedies under the umbrella of "equitable tolling." *See, e.g., Ribot v. Farmers Ins. Grp.*, No. CV 11-02404 DDP (FMOx), 2013 WL 3778784, at *16 (C.D. Cal. July 17, 2013) ("Equitable tolling is appropriate where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." (citation omitted) (internal quotation marks omitted)). In *Stoll*, as quoted above, the Ninth Circuit itself seems to have abandoned the distinction between equitable tolling and equitable estoppel, instead referring to the two remedies together as "equitable tolling." Thus, in determining whether to grant plaintiffs' request, I shall consider both doctrines.

Page 31 - OPINION AND ORDER

00225-WHO, 2013 WL 4082137, at *8 (N.D. Cal. Aug. 9, 2013) (finding that defendants' refusal to provide contact information for potential plaintiffs was not a basis for equitably tolling the statute of limitations), *and Rose*, 2011 WL 208044, at *2 (same), *with Ribot*, 2013 WL 3778784, at *17 (finding equitable tolling appropriate where the defendant refused to provide potential plaintiffs' contact information), *and Adams v. Inter-Con Sec. Sys., Inc.*, 242 F.R.D. 530, 542-43 (N.D. Cal. 2007) (same). Those courts that find equitable tolling is not appropriate usually cite to the fact that a defendant is not required to provide contact information for potential plaintiffs until after the court has conditionally certified the collective action. *See, e.g., Rose*, 2011 WL 208044, at *2. On the other hand, those courts that find equitable tolling is appropriate usually rely on the fact that potential plaintiffs, through no fault of their own, did not receive notice of the pending action as a result of the defendant's refusal to provide contact information. *See, e.g., Adams*, 242 F.R.D. at 543.

I agree with those courts that have found equitable tolling is not appropriate where a defendant withholds contact information for potential plaintiffs prior to conditional certification of the collective action. TriMet's decision to withhold that information cannot be characterized as "wrongful conduct" where TriMet had no obligation to disclose the information. Moreover, nothing has prevented potential collective-action members from filing their own independent action so as to toll the statute of limitations. Plaintiffs suggest that potential plaintiffs will be "prejudiced by their lack of knowledge of this lawsuit," *Hoffmann-La Roche* Motion, #19, at 18, but I find no reason why this situation is different from any other situation where a civil plaintiff is ignorant of his or her rights and, thereby, unintentionally allows a statute of limitations to run. *See Stallcop*, 820 F.2d at 1050 (declining to equitably modify the statute of limitations where the

plaintiff merely argued she mistakenly believed a one-year statute of limitations applied). Thus, I find that the statute of limitations should not be tolled as of the date when the original complaint was filed or as of the date plaintiffs' counsel asked TriMet to produce contact information for prospective collective-action members.

I do, however, find it appropriate to toll the statute of limitations from August 8, 2013, to the date of this order. I find this period is properly excluded on the following basis: plaintiffs filed their *Hoffmann-La Roche* motion on July 3, 2013, TriMet filed its resistance on July 22, 2013, and plaintiffs filed their reply on August 8, 2013. This matter did not come on for oral argument until September 17, 2013, as a result of the court's schedule and the fact that I wished to hear oral argument on plaintiffs' *Hoffmann-La Roche* motion at the same time as oral argument on TriMet's motion for partial summary judgment. This delay is through no fault of prospective collective-action members. Accordingly, I shall grant in part plaintiffs' request to equitably toll the statute of limitations. The statute of limitations is tolled from the date that plaintiffs' motion was ripe for decision, August 8, 2013, to the date of this order. *See Koval v. Pac. Bell Tel. Co.*, No. C 12-1627 CW, 2012 WL 3283428, at *7 (N.D. Cal. Aug. 10, 2012) (noting that courts "have applied equitable tolling prospectively where the court's discretionary case management decisions have led to procedural delay beyond the control of the putative collective action members").

C.     **Form of Notice**

Next, plaintiffs request that the court approve its proposed notice, attached as Exhibit A to plaintiffs' *Hoffmann-La Roche* motion. The notice, addressed to "all individuals currently or formerly employed by [TriMet] as a bus or train operator or in an equivalent position at any time

Page 33 - OPINION AND ORDER

on or after January 22, 2010," generally describes the lawsuit and instructs potential plaintiffs

how to join. Ex. A, *Hoffmann-La Roche* Motion, #19, at 1-4. Attached to the notice is a

consent-to-join form, which potential plaintiffs are instructed to fax or mail to plaintiffs' counsel

within ninety days of the date that plaintiffs' counsel mails the notice. In its resistance, TriMet

lodges various objections to the form of the notice. After reviewing the proposed notice and

TriMet's objections, I have provided a revised notice to the parties and have attached a copy to

this order. The parties are directed to confer and, if either party has any objection to the revised

notice, such party is directed to contact the court within five days of the date of this order, at

which time I shall schedule a telephonic hearing to address the objection. With this in mind, I

turn now to address some of the parties' more significant disputes over the form of the notice.

First, I agree with plaintiffs that, although I have denied plaintiffs' request to equitably toll

the statute of limitations for opt-in plaintiffs as of the date the complaint was filed, it is

appropriate to send notice to all bus and train operators employed on or after January 22, 2010.

As plaintiffs note, "discovery may show that at least certain plaintiffs may be eligible for

equitable tolling and that [TriMet] acted willfully in violating the [FLSA] as alleged in the

operative complaint." Reply in Support of *Hoffmann-La Roche* Motion, #36, at 10-11; *see also*

*Houston v. URS Corp.*, 591 F. Supp. 2d 827, 835 (E.D. Va. 2008) ("[A]t this stage, based on the

record before the Court, this Court is not prepared to make the factual determinations necessary

to short a class period that might prove to be appropriate. Moreover, judicial economy is served

by conditionally certifying and providing notice to a larger rather than a smaller class."); *Herrera*

*v. Unified Mgmt. Corp.*, No. 99 C 5004, 2000 WL 1220973, at *2 (N.D. Ill. Aug. 18, 2000) ("The

court finds that the Notice should reference three years, and, if necessary, the class can later be

Page 34 - OPINION AND ORDER

restricted. It is more efficient to later restrict the class than to later propose, revise through a

series of briefs, and send out another notice.").

Second, I reject TriMet's proposal to strike the following language, which appears on the

first page of the notice: "A Court authorized this notice. This is not a solicitation from a lawyer."

Ex. A, *Hoffmann-La Roche Motion*, #19, at 1. In support of its request to strike the language,

TriMet states only that the language is "not true" because the notice is a solicitation from a

lawyer. Resistance to *Hoffmann-La Roche Motion*, #26, at 17. For the reasons set forth in

plaintiffs' reply, I disagree. Specifically, the proposed language signals to the reader that the

notice is not a mere marketing ploy. Moreover, as plaintiffs note, several district courts have

upheld the inclusion of nearly identical language. *See, e.g., Lee v. Veolia ES Indus. Servs., Inc.*,

No. 1:12-cv-136, 2013 WL 2298216, at *2 (E.D. Tex. May 23, 2013) (authorizing a notice that

included the language, "A court authorized this notice. This is not a solicitation from a lawyer.");

*Williams v. ezStorage Corp.*, Civil Action No. RDB-10-3335, 2011 WL 1539941, at *3 (D. Md.

Apr. 21, 2011) (same); *Sharpe v. APAC Customer Servs., Inc.*, No. 09-cv-329-bbc, 2010 WL

1292154, at *2 (W.D. Wis. Mar. 29, 2010) (rejecting the defendant's objection to the language

"[t]his is not a solicitation from a lawyer"); *In re Milos Litig.*, No. 08 Civ. 6666 (LBS), 2010 WL

199688, at *3 (S.D.N.Y. Jan. 11, 2010) (authorizing a notice that included the language, "A court

authorized this Notice. This is not a solicitation from a lawyer."); *Lewis v. Wells Fargo & Co.*,

669 F. Supp. 2d 1124, 1131 (N.D. Cal. 2009) (same); *Francis v. A & E Stores, Inc.*, No. 06 Civ.

1638(CLV)(GAY), 2008 WL 2588851, at *4 (S.D.N.Y. June 26, 2008) (authorizing a notice that

included the language "[t]his is not a solicitation from a lawyer").

Third, I reject TriMet's proposal to add the following language under the section titled

"Effect of Joining This Lawsuit": "If TriMet wins the lawsuit, you and the other plaintiffs will be responsible for payment of the costs of the lawsuit, such as filing fees, prevailing party fees and any other litigation costs which may be assessed against the losing party by the Court." Resistance to *Hoffmann-La Roche* Motion, #26, at 17. Plaintiffs argue that this language "would be misleading and would have an unjustified and unnecessarily chilling effect on the willingness of the opt-in plaintiffs to participate." Reply in Support of *Hoffmann-La Roche* Motion, #36, at 18. I agree with plaintiffs and the authority they cite in support of their argument. While liability for costs is certainly a factor a potential collective-action member would weigh as part of his or her decision as to whether to join the action, an isolated reference to costs is likely to have a chilling effect, particularly without any mention of the extent of liability. Rather, I agree with plaintiffs that "[t]his is a discussion that should take place between the client and attorney who can provide sufficient contextual information to allow the client to evaluate the risks." *Id.*; *see also Williams v. U.S. Bank Nat'l Ass'n*, 290 F.R.D. 600, 613 (E.D. Cal. 2013) (noting that the "defendant has not identified a single instance where [a] FLSA class plaintiff has been taxed the costs of suit," and concluding that "it appears that the proposed warning would have the sole effect of chilling potential plaintiffs' participation in this lawsuit").

Finally, I agree with plaintiffs that a ninety-day period for potential plaintiffs to mail the consent-to-join form is appropriate. TriMet contends that "such a long period will limit TriMet's discovery due to fear that it may contact represented employees, and create excessively generous opportunities for plaintiffs to generate a larger collective class." Resistance to *Hoffmann-La Roche* Motion, #26, at 19. For the reasons set forth in plaintiffs' reply, I disagree and adopt plaintiffs' proposal of a ninety-day period.

Page 36 - OPINION AND ORDER

**D.     Method of Notice**

I next consider whether plaintiffs have proposed appropriate methods of notification. Plaintiffs ask the court to authorize plaintiffs' counsel to mail and/or email notice of the action to all prospective collective-action members and also post the notice "at each of [TriMet's] divisions, transit centers, and layover locations." *Hoffmann-La Roche* Motion, #19, at 1.  TriMet objects to notifying prospective collective-action members by email and "any posting of the [n]otice at TriMet's facilities, especially facilities that are open to the public such as platforms, transit centers, and bus shelters."  Resistance to *Hoffmann-La Roche* Motion, #26, at 16.

First, because TriMet does not object and because I find that it is an appropriate and effective means of notifying potential collective-action members, I shall authorize plaintiffs' counsel to mail the notices.

Second, I agree with plaintiffs that notifying potential collective-action members of the pendency of this action by email is also appropriate.  TriMet notes that *Hoffmann-La Roche* "upheld only the production of names and addresses of employees to facilitate notice" but did not discuss notice by email. *Id.* at 15. *Hoffmann-La Roche*, however, was decided in 1989—there is no indication that the Supreme Court was asked to rule on the appropriateness of email notification at a time when relatively few people had access to computers.  In contrast, people regularly correspond by email today.  TriMet also states that it may not have current email addresses for all current and former employees and argues that "some employees consider personal e-mail addresses to be private information not for public use." *Id.*  I find such arguments unavailing.  TriMet can produce whatever email addresses it does have and, for those employees for which TriMet does not have email addresses, they can learn about this action

through one of the other methods of notice.  Furthermore, I find "that email is an efficient and

nonintrusive method of communication." *Alequin v. Darden Rests., Inc.*, No. 12-61742-CIV,

2013 WL 3945919, at *2 (S.D. Fla. July 31, 2013) ("[C]ourts in this Circuit commonly approve

email notice to potential opt-in class members in FLSA cases."); *see also Ritz v. Mike Rory

Corp.*, 12 CV 367(JBW)(RML), 2013 WL 1799974, at *5 (E.D.N.Y. Apr. 30, 2013) (permitting

notification by email); *Rehberg v. Flowers Foods, Inc.*, No. 3:12cv596, 2013 1190290, at *3

(W.D.N.C. Mar. 22, 2013) (same); *Jones v. JGC Dallas LLC*, Civil Action No. 3:11-CV-2743-O,

2012 WL 6928101, at *5 n.9 (N.D. Tex. Nov. 29, 2012) (collecting cases approving email notice

in FLSA cases).

Third, I shall grant in part plaintiffs' request to post the notice at TriMet facilities.  While

I agree that posted notices are an effective means of reaching potential plaintiffs that, for

whatever reason, did not receive notice by mail or email, plaintiffs have offered no reason why it

is necessary to post the notice at platforms, transit centers, and bus shelters—places open to the

public.  Accordingly, I shall permit posting of the notice only at TriMet facilities not open to the

public.

### E.    Contact Information

Finally, plaintiffs ask that the court "order [TriMet] to produce to [p]laintiffs' counsel the

names, address information, e-mail addresses, and telephone numbers of all prospective

collective action members . . . and that such information shall be provided in Microsoft Excel

format to [p]laintiffs' counsel within ten (10) days of the date of the [c]ourt's order." *Hoffmann-

La Roche* Motion, #19, at 1.  TriMet objects on the grounds that plaintiffs' request is an improper

discovery motion, the production of the contact information to plaintiffs is unnecessary, and the

Page 38 - OPINION AND ORDER

Oregon Rules of Professional Conduct prohibit attorneys from using the telephone or email to solicit prospective clients.

I find that TriMet's arguments are largely unpersuasive. Courts routinely order a defendant to produce contact information for potential collective-action members after the court has conditionally certified the collective action. *See* Reply in Support of *Hoffmann-La Roche* Motion, #36, at 20-22 (listing cases); *see also Hoffmann-La Roche*, 493 U.S. at 170 ("The District Court was correct to permit discovery of the names and addresses of the discharged employees."). Indeed, that would appear to be one of the goals of seeking conditional certification. Thus, I shall order TriMet to produce the names, mailing addresses, and email addresses for all of its current and former bus and train operators that were employed on or after January 22, 2010.

However, I find that plaintiffs have failed to offer any reason why TriMet needs to produce employees' telephone numbers. Plaintiffs have not proposed notifying potential plaintiffs by telephone and I would not permit plaintiffs to do so. The consent-to-join form includes a space for an opt-in plaintiff to write his or her telephone number and, thus, plaintiffs' counsel will have the telephone number of any individual that wishes to join the lawsuit. Accordingly, I find that TriMet need not produce its current and former employees' telephone numbers. *See Calder v. GGC-Baltimore, LLC*, Civil No. BPG-12-2350, 2013 WL 3441178, at *3 (D. Md. July 8, 2013) (denying the plaintiffs' request for potential plaintiffs' telephone numbers); *Harvey v. AB Electrolux*, 857 F. Supp. 2d 815, 819-20 (N.D. Iowa 2012) (same); *Houston*, 591 F. Supp. 2d at 836 (same).

///

Page 39 - OPINION AND ORDER

CONCLUSION

For the reasons discussed above, TriMet's motion for partial summary judgment (#30) is granted and plaintiffs' *Hoffmann-La Roche* motion (#19) is granted in part and denied in part. It is hereby ordered:

(1)     Pursuant to the FLSA and cases interpreting it, the court finds that all current and former bus and train operators employed by TriMet on or after January 22, 2010, are similarly situated. The court therefore conditionally certifies this action as a representative collective action under 29 U.S.C. § 216(b).

(2)     TriMet shall provide to plaintiffs the names, mailing addresses, and email addresses for all current and former bus and train operators employed by TriMet on or after January 22, 2010. TriMet shall provide this information in Microsoft Excel format to plaintiffs' counsel within ten (10) days of the date of this order.

(3)     The parties are directed to confer regarding the attached revised notice. If either party has any objection to the revised notice, such party is directed to contact the court within five (5) days of the date of this order. If there is no objection to the revised notice, plaintiffs shall mail the revised notice to all potential plaintiffs no later than ten (10) days following TriMet's disclosure of the contact information.

Dated this 10th day of October, 2013.

Honorable Paul Papak
United States Magistrate Judge