IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALLEN MARGULIES et al.,

                              Plaintiffs,                         3:13-cv-00475-PK

v.                                                    OPINION AND ORDER

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT
OF OREGON,

                              Defendant.

---

PAPAK, Magistrate Judge:

       Plaintiffs filed this putative class action against defendant Tri-County Metropolitan

Transportation District of Oregon ("TriMet"), alleging that TriMet engages in a pattern or

practice of failing to pay its bus and train operators for all compensable work in violation of the

federal Fair Labor Standards Act ("FLSA") and Oregon law.  Now before the court are TriMet's

"Motion for Partial Summary Judgment as to All State Law Claims" ("State Law MPSJ") (#146)

Page 1 - OPINION AND ORDER

and "Motion for Partial Summary Judgment as to Max Operators' FLSA Overtime Claims"

("FLSA MPSJ") (#153).  For the reasons discussed below, TriMet's State Law MPSJ is denied

and its FLSA MPSJ is denied in part and granted in part.

**PROCEDURAL BACKGROUND**

On December 19, 2012, named plaintiff Allen Margulies sent a letter to TriMet,

indicating that he intended to file a lawsuit "on behalf of all current employees and former

employees of TriMet" due to TriMet's alleged failure to compensate its employees for all hours

worked and its alleged failure to pay overtime wages.  Ex. A, Declaration of Joel B. Young

("Young Decl."), #124-1, at 1.  The caption of the letter states that it is a notice of a class action

pursuant to Oregon Rule of Civil Procedure 32H.  *Id.*  On January 14, 2013, named plaintiffs

Stephen Fung and Christopher Day also sent TriMet a notice of intent to file a class action "on

behalf of all current and former employees of TriMet."  Ex. C, Young Decl., #124-1, at 1.  Like

Margulies, Fung and Day also cited TriMet's alleged failure to fully compensate its employees as

the basis of the class action.  *Id.*  On January 17, 2013, TriMet responded to both letters, stating

that, as public employees, Margulies, Fung, and Day were subject to a collective bargaining

agreement, which governed the wage issues raised in the letters.  Ex. B, Young Decl., #124-1, at

1; Ex. D, Young Decl., #124-1, at 1.

Thereafter, on January 22, 2013, Margulies filed an action against TriMet in the

Multnomah County Circuit Court, alleging various claims under the FLSA and Oregon law on

behalf of himself and "all other similarly situated individuals currently and/or formerly employed

by" TriMet.  Ex. 3, Declaration of Jennifer Goodrich ("Goodrich Decl."), #122-3, at 1.  On

February 15, 2013, Margulies filed an amended complaint in the Multnomah County Circuit

Page 2 - OPINION AND ORDER

Court, adding Day and John Olsen as named plaintiffs. Ex. 4, Goodrich Decl., #122-4, at 1. On

February 21, 2013, TriMet was served with a copy of the complaint and the amended complaint.

Ex. 5, Goodrich Decl., #122-5, at 1-3.

On February 25, 2013, Fung and Day sent TriMet a second notice of their intent to file a

class action, again citing TriMet's alleged failure to fully compensate its employees as the basis

of the suit. Ex. E, Young Decl., #124-1, at 1. TriMet responded on March 14, 2013, noting that

Fung and Day's claims were already included in the action filed in the Multnomah County Circuit

Court and again stating that, as public employees, Fung and Day were subject to the collective

bargaining agreement, which governed the wage issues raised in their letter. Ex. F, Young Decl.,

#124-1, at 1. Fung sent yet another notice on May 29, 2013. Ex. G, Young Decl., #124-1, at 1.

TriMet again responded that Fung's claims were part of the pending lawsuit and, in any case, the

applicable collective bargaining agreement governed the wage issues raised in Fung's letter. Ex.

H, Young Decl., #124-1, at 1.

Meanwhile, on March 20, 2013, TriMet removed the Multnomah County case to this

court on the basis of federal-question and supplemental jurisdiction. Notice of Removal, #1, at

1-3. On June 17, 2013, plaintiffs filed their second amended complaint. In their second

amended complaint, plaintiffs allege that TriMet fails to pay bus and train operators for: "(1)

non-commute travel time between disparate start and end points of operators' scheduled runs, (2)

the differential between scheduled run times and actual run times, (3) pre-departure time, (4)

mandatory meetings with supervisors, (5) mandatory medical examinations, and [(6)] any

applicable overtime due for such compensable time." Second Amended Complaint, #18, ¶ 4.

On October 10, 2013, this court granted TriMet's motion for partial summary judgment

and dismissed plaintiff-bus drivers' FLSA claims.  October 10, 2013, Opinion and Order, #61, at

40.  The court also granted plaintiffs' motion to conditionally certify the action as a representative

collective action under 29 U.S.C. § 216(b) and set a deadline of January 27, 2014, for collecting

consent-to-join forms.  *Id.*  As of this date, 458 plaintiffs have opted to join the action, including

the four named plaintiffs.[1]

On September 8, 2014, this court granted in part TriMet's motion for partial summary

judgment on all of plaintiffs' state law claims due to sixty-five plaintiffs' failure to provide

timely notice under the OTCA.  September 9, 2014, Opinion and Order, #136.  The court,

however, denied TriMet's motion as it applied to twenty-eight plaintiffs.

TriMet filed the State Law MPSJ (#146) on December 31, 2014, seeking summary

judgment on plaintiffs' state law claims for violation of Oregon's minimum wage and overtime

statutes under ORS 653.268.  On January 28, 2015, plaintiffs filed their resistance (#156).  On

February 27, 2015, TriMet filed its reply (#161).  On February 24, 2015, this court granted

plaintiffs' Motion for Order to Allow Sur-Reply (#164).  On March 4, 2015, plaintiffs filed their

sur-reply (#165).

TriMet filed the FLSA MPSJ (#153) on January 23, 2015, seeking summary judgment on

plaintiffs' claim alleging TriMet's failure to pay overtime wages to MAX operators in violation

of the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1).  On March 4, 2015, plaintiffs filed their

resistance (#166).  On March 23, 2015, TriMet filed its reply (#180).  On April 1, 2015, this

---

[1]  TriMet states that 457 plaintiffs, including the four named plaintiffs, have opted to join
the lawsuit.  It appears, however, that TriMet listed Roberto Silva on its list of plaintiffs twice
and did not include Robert C. DePew, who filed a consent-to-join form on November 19, 2013,
and Leurine Jackson, who filed a consent-to-join form on February 26, 2014.

court denied (#185) plaintiffs' contested Motion to Allow Sur-Reply (#183).[2]

The court heard oral argument on both of TriMet's motions on April 14, 2015.  Following oral argument, Plaintiffs filed a statement regarding supplemental authority offered by TriMet during the proceedings (#189).  On April 16, 2015, TriMet moved to strike Plaintiffs' statement (#189).  The matter is fully submitted and ready for decision.

### FACTUAL BACKGROUND[3]

TriMet operates and provides public transportation services throughout Multnomah, Washington, and Clackamas counties.  TriMet manages various bus and train routes, schedules, and working conditions for its employees.  Zatarain Depo., Young Decl., #157, Ex. A, 106:1. The employment of TriMet's various operators is guided by the Working and Wage Agreement ("WWA").[4]  Lomax Decl., #148, Ex. 1 ("WWA, #148-1").  Under the WWA, TriMet operators are paid a normal hourly rate and time and one-half of their regular pay rate for all overtime

---

[2]  The court found that none of Plaintiffs' arguments in support of their motion to allow a sur-reply (#183) actually demonstrated that TriMet, in its Reply (#180), attempted to "introduce[] entirely new issues, authorities and evidence," as averred by Plaintiffs.  Instead, the contested aspects of TriMet's Reply were submitted in direct response to evidence raised in plaintiffs' resistance, which the court found to be permissible and did not require a sur-reply.  *See Edwards v. Toys 'R' Us*, 527 F. Supp. 2d 1197, 1205 n.31 (C.D. Cal. 2007).

[3]  In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party and may neither make credibility determinations nor perform any weighing of the evidence.  *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–55 (1990).

[4]  The WWA has been operative for the relevant time period in this case, from December 1, 2009 through November 30, 2012, and month-to-month following that time.  Def.'s State Law Motion, #146, 4, ¶ 8.  The parties have negotiated a revised WWA as recently as October 24, 2014.  That revised agreement has not yet been fully executed, but the parties are nonetheless operating pursuant to its terms.  Decl. Lomax, #148, ¶¶ 2–3.

worked, which consists of all work over eight hours per regular work day as well as work over

forty hours per week, unless otherwise specified in the WWA.  #148-1, Art. 1, § 6, ¶ 1.

On a day-to-day basis, TriMet uses Hastus, a computer software system, to schedule its

routes of operation and calculate pay amounts for its operators.  Zatarain Depo., Young Decl.,

#157, Ex. A, 25:25.  The route assignments themselves are contained within collective

documents called "Run Listings" that determine driving time, report time, and clear time.  *Id.* at

25:25.  These determinations are used to formulate the calculation for total pay for an operator's

daily assignment.  Lomax Depo., Young Decl., #157, Ex. B, 25:25.  TriMet bus operators are

paid daily between $1.75 and $2.50 in "road relief" when they work an assignment ending in a

location that differs from its starting point.  WWA, #148-1, Art. 2, § 1, ¶ 2g.  TriMet rail

operators are paid between $3.50 and $15.00 in "road relief."  WWA, #148-1, Art. 2, § 9, ¶ 11a.

TriMet does not consider "road relief" compensation for time worked.  WWA, #148-1, Art. 2, §

1, ¶ 2b.

Per the WWA, in instances where a bus or MAX train arrives late to its relief point, the

relief bus or MAX operator takes over operation of the vehicle at that time and is paid based on

the scheduled run rather than the late start.  WWA, #148-1, Art. 2, § 1, ¶ 2b.

Approximately once every three months, all operators submit bids to work various

scheduled run assignments that are awarded on the basis of seniority.  Lomax Decl., #148, ¶¶

10–11.  Run assignments are posted at TriMet's garages and rail yards to allow for the operators

to become aware of their details before submitting bids.  After bidding concludes, operators are

aware of their scheduled work assignments for the upcoming quarter.  *Id.* at ¶ 11.

On their routes, operators begin at one point and end at another, purportedly requiring

them to engage in "non-commute" travel time between those points once a scheduled run ends. Olsen Decl., #43.  Operators who commute to work from their home must travel from their "end-shift point" by another means of transportation to the point at which they began their route, called their "start-shift" point, in order to recover their personal vehicle or begin their commute back to their home.  Zatarain Depo., Young Decl., #157, Ex. A, 44–47:20.  This travel time, called "Start-End Travel Time," is not considered ordinary commute travel and exists only as a product of TriMet's route and scheduling practices for the convenience and cost efficiency of TriMet.  *Id.*

If time between two parts of a "split run" amounts to not more than one hour, a TriMet operator is automatically paid for the time between the two parts.  WWA, #148-1, Art. 2, § 1, ¶ 2f.  If, on the other hand, that time amounts to more than one hour, the time is considered unpaid break time.  WWA, #148-1, Art. 2, § 1, ¶ 5a.  Although not specifically articulated in the WWA, TriMet requires operators to submit a "Time Slip" to recover additional wages when scheduled runs arrive late, when they are required to perform other unscheduled work, when they spend time meeting with a manager when they are off-duty, or when they arrive late to their destination while on a run.  Lomax Decl., #148, ¶¶ 21, 25–26; WWA, #148-1, Art. 2, § 1, ¶ 2b.  Between these "split runs," TriMet operators are required to engage in non-commute travel between the geographical end point of the first run and the geographical start point of the second run.  Olsen Decl., #43, 3.  Like "Start-End Travel Time," this "Split-Shift Travel Time" is caused by TriMet's scheduling through Hastus and is for TriMet's financial and logistical convenience.  Zatarain Depo., Young Decl., #157, Ex. A, 44–47:20.  Beyond the wages allotted for split-run delays of less than one hour, TriMet does not pay overtime for "Split-Shift Travel Time."  Zatarain Depo., Young Decl., #157, Ex. A, 28:10–13.

Page 7 - OPINION AND ORDER

Relief operators must relieve initial operators at relief locations that may be geographically distant from the relief operators' home garage. Relief operators arrive early to the relief location based on a policy instructing them to take a bus or train that is "at least two (2) buses and/or trains ahead of the bus and/or train that would get such Operator to the relief point at the exact time of (or just before) the relief that such Operator is making." Pl.'s Response to State Law MPSJ, #156, 4 (citing Olsen Decl., #43; Morgan Depo., Young Decl., #157, Ex. C, 28:10–13). This policy results in relief operators arriving at their relief locations before the scheduled relief time. Zatarain Depo., Young Decl., #157, Ex. A, 87:12–21. Plaintiffs dub this time difference "Pre-Departure Time" and allege that it is not provided for in the WWA. If a relief operator arrives late to his or her relief location, the operator may be charged with an "oversleep," which can carry a penalty of one day's pay and, potentially, termination. Morgan Depo., Young Decl., #157, Ex. C, 24–26.

In certain situations, TriMet operators are not compensated for (1) time spent meeting with supervisors in connection with payroll corrections; (2) travel time from a relief point to the location of a meeting that an operator is obligated to attend with a supervisor; and (3) the time spent between the end of a daily run assignment and the beginning of the meeting. *See* Lomax Depo., Young Decl., #157, Ex. B, 62:12–18; Yazzolino Depo., Young Decl., #157, Ex. D, 18:17–24; Olsen Decl., #43. Plaintiffs refer to this collectively as "Meeting Time." According to TriMet's Executive Director of Transportation, "[w]hen an operator is not on duty and is required to attend a meeting with his or her supervisor, the operator completes a Time Slip in order to document the amount of time taken by the meeting and to receive payment for the time." Decl. Lomax, #148, ¶ 26.

Page 8 - OPINION AND ORDER

Operators are required to obtain medical and other physical examinations in connection with their employment with TriMet.  Lomax Depo., Young Decl., #157, Ex. B, 113:3–20; Olsen Decl., #43, ¶¶ 13–17.  Plaintiffs maintain that TriMet's policy is to not provide compensation to operators for time spent in connection with obtaining these medical examinations.

Based on TriMet's Hastus scheduling, operators are paid according to a predetermined schedule rather than their actual drive time.  Plaintiffs allege that scheduled runs can and do arrive at their end points after scheduled arrival times due to uncontrollable logistical and operational circumstances.  Lomax Depo., Young Decl., #157, Ex. B, 58:14–59:7; Olsen Decl., #43, 3–4.  Further, TriMet maintains a policy requiring operators to not operate their vehicles ahead of schedule so as not to run "hot."   Olsen Decl., #43, ¶ 20.  TriMet additionally requires walkthrough inspections of vehicles prior to arriving at a garage but does not allocate any scheduled time for those inspections.  Young Decl., #157-10, Ex. I, 18.  Finally, TriMet sets its automated running times so that scheduled run time is the same as or greater than 60–80% of actual run times.  Zatarain Depo., Young Decl., #157, Ex. A, 41:4–12.  Plaintiffs refer to the inconsistencies and regular lateness arising out of TriMet's policies and practice as "Routinely Late Time."  Pl.'s Response to State Law MPSJ, #156, 7.  TriMet monitors vehicle locations using GPS devices installed on all vehicles which track and record routine and late runs.  Zatarain Depo., Young Decl., #157, Ex. E, 74–77.  TriMet requires its operators to complete "Trip Sheets" that can be used to record run times and track when runs arrive at their end points after the scheduled arrival time.  *Id.* at 77–79.  TriMet records vehicles during their runs with static cameras and reviews those recordings.  Lomax Depo., Young Decl., #157, Ex. B, 148:18–152:6.  TriMet tracks "on-time performance" of its vehicles, which allows TriMet to

Page 9 - OPINION AND ORDER

determine when and whether those vehicles arrive after their scheduled arrival times, and has a policy of considering vehicles arriving up to five minutes late as arriving "on time."  Callas Depo., Young Decl., #157, Ex. E, 26:13–27.  TriMet also has received numerous reports from its operators informing it that vehicles regularly arrive later than scheduled.  Young Decl., #157, Ex. H.  Finally, TriMet's management is aware that operators, at times, do not turn in Time Slips when they arrive later than scheduled.  Morgan Depo., Young Decl., #157, Ex. C, 42:13–18; Cook Depo., Young Decl., #157, Ex. F, 16:14–17.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is not proper if material factual issues exist for trial.  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).  The substantive law governing a claim or defense determines whether a fact is material.  *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).  In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party and may neither make credibility determinations nor perform any weighing of the evidence.  *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–55 (1990).

## DISCUSSION

TriMet seeks summary judgment of Plaintiffs' state law claims for violation of Oregon's minimum wage and overtime statute, ORS 653.268.  TriMet contends that summary judgment is appropriate because the parties operate under the WWA and, because public policy of the State of Oregon favors such agreements for public employees, the court should conclude that the WWA defines the circumstances under which TriMet must pay wages and overtime under ORS 653.268.  Plaintiffs respond that they have a clear and unambiguous right under ORS 653.268 to receive overtime pay when they perform work in excess of forty hours per week, that they have not expressly waived their right to overtime wages with respect to several categories of work Plaintiffs maintain are not contemplated under the WWA, and that the definition of the word "work" should not be determined by the WWA but should be assigned its common, ordinary meaning.

Resolution of these issues hinges on the definition given to the terms "time worked" and "overtime worked," neither terms being specifically defined in the WWA or by the relevant statute.  TriMet argues that the meaning of those terms should be gleaned from the categories of work specifically addressed in the WWA.  Plaintiffs counter that ORS 653.268 controls and that the term "worked" should be given its common, dictionary definition.

TriMet also moves for summary judgment on plaintiffs' first claim for relief alleging TriMet's failure to pay overtime wages to its MAX operators, or rail operators, in violation of the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1).[5]  TriMet contends that summary judgment is

---

[5]  On October 10, 2013, due to statutory exemptions contained in the Motor Carrier Act, I granted summary judgment in favor of TriMet and dismissed from this action the claims of TriMet bus operators brought under the FLSA. Opinion & Order on TriMet's Motion for Partial

appropriate because the MAX operators have been fully compensated for their working hours consistent with the requirements of the FLSA, the Portal to Portal Act, and the terms of the WWA.  Def.'s FLSA MPSJ, #153, 1.  Plaintiffs respond that TriMet has failed to pay MAX operators for all compensable time worked pursuant to the FLSA and the federally mandated straight time and time and one half of regular rate of pay for hours worked in excess of forty hours per week.  Pl.'s FLSA MPSJ Response, #166, 1.

I.    **The Statutory Framework and Applicable Definitions of "Work"**

A.    **Oregon Law**

1.    **Relevant Wage Statutes**

TriMet first moves against Plaintiffs' claim that TriMet violated ORS 653.268 by failing to pay operators for overtime worked in excess of 40 hours in any one week at a rate of time and one-half or compensatory time off at that rate if budgeted funds were not available.  Second Amended Complaint ("SAC"), #18, ¶ 45.  TriMet maintains that this claim must fail because ORS 653.268 does not offer a definition of "time worked" and does not enumerate the categories of work time for which Plaintiffs seek payment, which are, as discussed above: "Start-End Travel Time"; "Split-Shift Travel Time"; "Pre-Departure Time"; "Meeting Time"; and "Routinely Late Time."  *See* Olsen Decl., #43.  TriMet asserts that the Oregon Bureau of Labor and Industries ("BOLI") regulations concerning working conditions and overtime wages do not apply to TriMet's operators due to the existence of the WWA, a negotiated collective bargaining agreement.  Def.'s State Law MPSJ, #146, 13–14.  TriMet asks the court to "recognize that a public body and its union-represented employees may reasonably determine what constitutes

Summary Judgment, #61, 25.

compensable work time in their negotiated collective bargaining agreement." *Id.*

The two statutes of import for the purposes of TriMet's State Law MPSJ are ORS 653.261 and ORS 653.268, which apply to private sector and public sector employees, respectively.  ORS 653.261(1) allows BOLI to "adopt rules prescribing such minimum conditions of employment, excluding minimum wages, in any occupation as may be necessary for the preservation of the health of employees."  ORS 653.261(1).  That statute suggests, without requiring, that BOLI may adopt rules related to overtime pay.  ORS 653.261(1).  The Commissioner of BOLI has, in fact, adopted rules related to overtime pay for "work" in excess of forty hours perk week.  OAR 839-020-0030.  It is uncontested, however, that these rules are inapplicable to TriMet employees.  *See* Def.'s State Law MPSJ, #146, 9 ("[P]ublic employees like plaintiffs are subject to ORS 653.268, instead of other Oregon statutes . . . ."); Pl.'s Response to State Law MPSJ, #156, 9 ("[P]laintiffs agree[] that these substantive rules are not applicable to TriMet employees").

Because TriMet is a public employer, the overtime requirements of ORS 653.268 are directly applicable to its employees.  ORS 653.268.  The relevant language of ORS 653.268(1) provides:

> Labor directly employed by any public employer as defined in ORS 243.650 shall be compensated, if budgeted funds for such purpose are available, for overtime worked in excess of 40 hours in any one week, at not less than one and one-half times the regular rate of such employment.  If budgeted funds are not available for the payment of overtime, such overtime shall be allowed in compensatory time off at not less than time and a half for employment in excess of 40 hours in any one week.'

ORS 653.268(1).

### 2.    The Applicable Definition of "Work" Under ORS 653.268

The parties argue past one another in addressing the applicable definition of "work" for the purposes of ORS 653.268, with Plaintiffs focusing on common law approaches to determine statutory definitions and TriMet focusing on the WWA only, without regard to the fact that the WWA does not contain a negotiated, comprehensive definition of the term "work."  *Compare* Def.'s State Law MPSJ, #146, 21–40 *with* Pl.'s Response to State Law MPSJ, #156, 10.  I acknowledge that the WWA provides for instances where categories of work, not otherwise scheduled, are compensable and may be paid overtime, including: (1) work greater than eight hours in any 24-hour period; (2) work performed after a completed run that was scheduled for less than eight hours; and (3) work performed without a break on a run because of delays or because a relief operator "oversleeps."  WWA, #148-1*, Art. 2, § 1, ¶ 5a.  However, because Plaintiffs assert that they are obligated by TriMet to perform additional duties that are not in fact addressed in the WWA, I find that determining the meaning of "work" as used in ORS 653.268 is important to this litigation, if not this motion.

Disputed interpretations of statutory language contained in ORS 653.268 and other related statutes have led Oregon courts to provide definitions in several prior cases.  In the absence of controlling agreements such as the WWA, the courts analyze the relevant statutory language in context and according to common definitions.  *See Young v. State of Oregon*, 161 Or. App. 32, 983 P.2d 1044, 1047 (1999) ("*Young I*").  In *Young I*, the Oregon Court of Appeals recognized that, when construing a statute, its role is limited "simply to ascertain[ing] and declar[ing] what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted . . . ." *Id.* (citing ORS 174.010; *PGE v. BOLI*, 317 Or.

606, 859 P.2d 1143 (1993)).  The *Young I* court then determined the meaning of the word "labor"

by looking to *Webster's Third New Int'l Dictionary* (unabridged ed. 1993).  Later, in lockstep

with its prior opinion, the Oregon Court of Appeals determined the plain meaning of the adverb

"directly" in the same manner.  *Young v. State of Oregon*, 177 Or. App. 295, 33 P.2d 995, 997

(2001) ("*Young II*").  Finally, in a subsequent case actually interpreting ORS 653.268, the

Oregon Supreme Court relied on the common definition of "regular rate."  *Young v. State of*

*Oregon*, 340 Or. 401, 407 (2006).  I find no reason to deviate from this trend in determining the

applicable definition of "work" as it applies to the relevant statute.

The common definition of "work" applies usefully here.  In defining "work," I consider

the Oregon Court of Appeals' discussion of "the concept of 'work' in an employment context" in

*Leonard v. Arrow-Tualatin, Inc.*, 76 Or. App. 120, 124 (1985).  In *Leonard*, a wage and hour

case, the court looked to the definition of "work" provided by the United States Supreme Court

as "physical or mental exertion (whether burdensome or not) controlled or required by the

employer and pursued necessarily and primarily for the benefit of the employer and his business."

*Id.* (citing *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590 (1944),

*superseded by statute*, Portal to Portal Act, 20 U.S.C. § 251 et al.).  The Supreme Court has also

included non-exertional acts in its definition of work.  *See Armour & Co. v. Wantock*, 323 U.S.

126, 133, 65 S.Ct. 165 (1944) (providing that work and exertion are not co-extensive as "an

employer ... may hire a man to do nothing, or to do nothing but wait for something to happen.").

I take particular note of four important facts: (1) this definition was offered by the Supreme Court

prior to the passage of the Portal to Portal Act, which significantly narrowed the applicable

definition of the word "work" under the FLSA; (2) the relevant Oregon statutory framework is

itself derived from the FLSA as enacted prior to modification by Portal to Portal Act.  *Dinicola v. State, Dept. of Revenue*, 246 Or. App. 526, 533 (2011); (3) Oregon has no statutory equivalent of the Portal to Portal Act; and (4) the Oregon Court of Appeals referred to and emphasized this definition in 1985, well after the FLSA was modified by the Portal to Portal Act.  For these reasons, I find the definition of "work" first articulated in *Tennessee Coal* and subsequently adopted in *Leonard* applicable to ORS 653.268.

B.     **"Work" Under the FLSA and Exemptions Under the Portal to Portal Act**

In contrast to the lack of a clear definition of "work" in the statutory framework giving rise to Plaintiffs' state law claims, discussed above, courts and Congress have defined in much more detail the concept of "compensable work" in the FLSA's mandate for overtime pay.  As discussed above, the Supreme Court defined "work" for FLSA purposes in the 1940s to include "physical or mental exertion controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business."  *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. at 590.  However, that definition "provoked a flood of litigation" and caused Congress to respond swiftly,  *Integrity Staffing Solutions, Inc. v. Busk*, 135 S. Ct. 513, 516, 190 L. Ed. 2d 410 (2014), with the Portal-to-Portal Act, which did not alter the Supreme Court's definition but specifically exempted employers from liability for future claims based on two categories of work-related activities as follows:

> (a)     Except as provided in subsection (b) [which covers work compensable by contract or custom], no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, . . . on account of the failure of such employer . . . to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after the date of the enactment of this Act—

> (1)    walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

> (2)    activities which are preliminary to or postliminary to said principal activity or activities,

> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities."

§ 4, 61 Stat. 86–87 (codified at 29 U.S.C. § 254(a)).  Additionally, in its syllabus attached to

*Integrity Staffing Solutions*, the Supreme Court offers the following helpful interpretation of

"principal activities":

> Under this Court's precedents, the term "principal activities" includes all activities which are an "integral and indispensable part of the principal activities." An activity is "integral and indispensable" if it is an intrinsic element of the employee's principal activities and one with which the employee cannot dispense if he is to perform his principal activities.

135 S. Ct. at 514, citing *Steiner v. Mitchell*, 350 U.S. 247, 252–253, 76 S. Ct. 330, 100 L. Ed.

267 (1956); *Mitchell v. King Packing Co.*, 350 U.S. 260, 262, 76 S. Ct. 337, 100 L. Ed. 282

(1956); 29 C.F.R. §§ 790.8(c), 790.7(g)).

With these standards and definitions in mind, I look to the categories of "work" offered

by Plaintiffs to determine whether those categories may fall into the relevant definition of "work"

under both the FLSA and Oregon law.

## II.    Significance of the Parties' Agreement in Determining Compensability

In arguing that TriMet failed to comply with the FLSA and Oregon law entitling public

employees to wages and overtime pay, Plaintiffs do not assert that TriMet caused any violations

of the parties' collective bargaining agreement, the WWA.  Instead, they maintain that I should look not to the WWA when determining whether TriMet pays its operators for all time "worked," but to the plain text of the statutes themselves to determine whether the categories of "work" complained of by Plaintiffs fall within the statutory requirement of ORS 653.268 or the FLSA. TriMet argues the opposite, asserting that "[f]or any definition of 'work' to assist the Court in deciding this motion, it must be related to the 'work' that the bus and MAX operators have been engaged to perform, as agreed to by the parties in the WWA."  Def.'s State Law MPSJ Reply, #161, 5.  I disagree with both parties' position as to the significance of the collective bargaining agreement in this case and conclude that the WWA is a predominant but not controlling factor in determining the compensability of the contested categories of work.

Oregon public policy and the statutory framework of ORS 243.650 to 243.782 outline negotiation requirements for collective bargaining agreements between public employers and their employees.  Accordingly, the WWA anticipates and provides for overtime pay consistent with ORS 653.268 and the FLSA, and is important to my consideration of overtime requirements.  However, the WWA does not, on its face, anticipate or provide for "Start-End Travel Time," Split-Shift Travel Time," "Pre-Departure Time," "Routinely Late Time," "Meeting Time," and "Medical Examination Time," which are all labels created by Plaintiffs for the various duties at issue in the instant motions.  Instead, the WWA in some instances anticipates "inconveniences" or "circumstances" that are roughly equivalent to Plaintiffs' proffered categories.  It does not, however, provide a comprehensive definition of what is "compensable work."

Employees' rights under the FLSA cannot be abridged, whether under a collective

bargaining agreement or otherwise. *Barrentine v. Arkansas Best Freight Sys.*, 450 U.S. 728, 101

S. Ct. 1437, 1445 (1981). However, "[c]ollective bargaining agreements are a 'predominant' but

not 'controlling' factor to be considered in determining whether the parties intended to define any

activity as work." *Levias v. Pacific Maritime Ass'n*, 760 F. Supp. 2d 1036, 1047 (W.D. Wash.

2011), *citing Berry v. County of Sonoma*, 30 F.3d 1174, 1181 (9th Cir. 1994). The Supreme

Court of the United States has stated that an inquiry into compensability involves "scrutiny and

construction of the agreements between the particular parties, [and] appraisal of their practical

construction of the working agreement by conduct . . . ." *Skidmore v. Swift*, 323 U.S. 134, 137

(1944).[6]

In *General Electric Co. v. Porter*, 208 F.2d 805 (9th Cir. 1953), the Ninth Circuit held

that the hours firefighters spent sleeping was compensable "waiting time" after looking to the

parties' collective bargaining agreement and finding that such time was not anticipated therein.

208 F.2d at 814. The court additionally held, interpreting *Skidmore*, that whether or not certain

activities could constitute compensable work time "depends upon the express or implied

agreement of the parties . . . ." *Id.* (*citing Skidmore*, 323 U.S. at 137).

I find no precedent in Oregon law, and the parties provide none, that provides clear

---

[6] I note the subtle inconsistency between the Supreme Court's holding that collective bargaining agreements that violate the FLSA are unenforceable and its holdings that collective bargaining agreements may nonetheless serve as factors in determining whether work is compensable. That inconsistency is resolved, however, by considering the agreement merely a predominant, rather than dispositive, factor in resolving "difficult and doubtful questions as to whether certain activity or nonactivity constitutes work." *See Berry v. County of Sonoma*, 763 F. Supp. 1055, 1059 n.12 (N.D. Cal. 1991), *citing Jewell Ridge Coal Corp. v. Local 6167, United Mine Workers*, 325 U.S. 161, 169–70 (1945).

guidance for determining whether additional duties imposed upon employees by employers may be considered compensable "work" in the absence of terms within a collective bargaining agreement speaking to contested duties. I note, however, that Oregon courts consider federal interpretations of the FLSA's statutory terms when interpreting ORS Chapter 653, as that statute is modeled after the FLSA. *Nkrumah v. City of Portland*, 261 Or. App. 365, 462 (2014), *citing Northwest Advancement, Inc. v. State of Oregon*, 96 Or. App. 133, 136–37 (1989); *Young v. State of Oregon*, 195 Or. App. 31 (2004), *rev'd on other grounds*, 340 Or. 401. For that reason, I look to the above cited Ninth Circuit and Supreme Court case law when determining compensability of the six disputed categories of "work," both under the state law claims and the FLSA.

### A.    Start-End Travel Time

#### 1.    Oregon Law

Start-End Travel Time, or the time that operators must spend returning to a relief location from a geographically distant ending point of their scheduled run, appears to be addressed in the WWA by way of a "road relief allowance." In the agreement, that allowance "represents compensation for the inconvenience associated with road reliefs," even though it is not "considered as pay for time worked for any purpose." WWA, #148-1, Art. 2, § 2, ¶ 2g. Due to the fact that start-end travel is not a primary activity of the operators but appears to nonetheless arise necessarily out of the operators' scheduled runs, I have "serious doubts as to whether [that] activity . . . constitutes work or employment," *Tennessee Coal, Iron & R.R. Co.*, 321 U.S. at 603, and I therefore to look the parties' agreement for evidence of the parties' intent to define Start-End Travel Time as work. *Berry*, 30 F.3d at 1181.

Upon analysis of the WWA, I find that the provision explicitly stating that road relief is not "considered as pay for time worked for any purpose" strongly evinces that the parties were aware of time expenditure associated with start-end travel and intended to exclude start-end travel from compensable hours subject to overtime pay, and instead negotiated this offset to assist those operators who suffered inconveniences arising from such travel. This is persuasive evidence that the parties did not intend to define this activity as work. *See, e.g., Berry*, 30 F.3d at 1181. TriMet's State Law MPSJ is therefore granted as it applies to Start-End Travel Time.

### 2.    The FLSA

As discussed above, the WWA's express provisions provide strong evidence that the parties did not intend to define Start-End Travel Time as compensable work. However, due to the postliminary nature of start-end travel and the Portal to Portal Act's bearing on the FLSA with respect to general commute time, I additionally consider whether Start-End Travel Time constitutes compensable work under the FLSA based on the relevant framework.

TriMet argues in support of its FLSA MPSJ that Start-End Travel Time falls within the Portal to Portal Act's exemption from FLSA requirements because a MAX operator's principal activity is the operation of a MAX train on an assigned run, and that principal activity does not include "time commuting to a rail yard or relief location" to recover a vehicle in order for an operator to begin his or her commute home. Def.'s FLSA MPSJ, #153, 9.

In response, Plaintiffs point to a number of cases arising under an express provision of the Portal to Portal Act that excepts travel time from the Act's exemption to the FLSA when employees are required to engage in such travel for the employer's benefit and the employer contractually agrees to pay for that travel. Pl.'s FLSA MPSJ Response, #166, 13. This

framework requires a court to look to contract or custom between the parties to determine whether that travel time is compensated, thereby triggering overtime obligations.  *Gilmer v. Alameda-Contra Costa Transit Dist.*, 2010 WL 289299, at *5 (N.D. Cal. Jan 15, 2010).  In cases where the travel time is itself compensated, then the expanded definition of "work" from the pre-Portal to Portal Act FLSA cases is applied, and the Portal to Portal Act's exemption for walking, riding, or traveling from FLSA coverage is inapplicable.  Pl.'s FLSA MPSJ Response, #166, 13; *see also* 29 C.F.R. § 790.7.

While Plaintiffs correctly construe the exception to the Portal to Portal Act's exemption, they fail to establish that Start-End Travel Time is explicitly addressed under the WWA as time worked, and therefore "compensable time" pursuant to this exception.  Plaintiffs ask this court to apply a multi-pronged analysis to determine whether "Start-End Travel Time" is, in fact, compensated work time, but ignore that a specific provision of the WWA expressly precludes that argument. WWA, #148-1, Art. 2, § 2, ¶ 2g. (providing that the rail relief allowance shall not be considered compensation for time worked for any purpose).  Because I find that the parties intended not to define Start-End Travel Time as compensable time, I disagree with Plaintiffs' position.  *See Gilmer*, 2010 WL at *7 (determining that start-end travel time would be calculated into total compensable time for purposes of determining overtime based on the applicable collective bargaining agreement's provision that "start-end travel time 'shall be computed on the scheduled running time of the services then available'").

I need not further address Plaintiffs' contentions relating to whether Start-End Travel Time can be considered compensable time worked under the FLSA, as that category cannot fall within the exception to the Portal to Portal Act's commute time exemption under the FLSA as a

matter of law.  Plaintiffs' arguments fail with regard to the FLSA both because evidence shows that the parties did not intend to define Start-End Travel Time as compensable work in the WWA and because, in any event, that activity is precluded under the Portal to Portal Act as the offset is disclaimed from being considered compensation for any purpose.  TriMet's FLSA MPSJ, therefore, is granted as it applies to Start-End Travel Time.

### B.    Split-Shift Travel Time

#### 1.    Oregon Law

Applying the same analytic framework as above, I find that Split-Shift Travel Time, or the time spent by operators between two consecutive shifts traveling to geographically disparate start locations, does not appear to be negotiated or provided for in the WWA.  The WWA clearly provides that runs with a break of "one (1) hour or less shall be guaranteed to be paid straight through such break without requirement of time slip," and, by implication, does not provide payment for split-shift periods greater than one hour.  WWA, #148-1, Art. 2, § 2, ¶ 2f.  Unlike the provision related to Start-End Travel Time, however, this provision provides no evidence that the parties anticipated travel required by operators during split-shift periods lasting longer than one hour.

On the record before me, I cannot discern whether the parties did or did not intend to define Split-Shift Travel Time as compensable work subject to overtime requirements. Accordingly, TriMet's State Law MPSJ is denied as it applies to Split-Shift Travel Time.

#### 2.    The FLSA

In terms of TriMet's FLSA motion, TriMet argues that Split-Shift Travel Time is fully compensated—and thus included in any overtime calculation—under the WWA if the time

between shifts is less than one hour, and if the time between shifts is greater than one hour it is considered an "unpaid, off-duty break, which the MAX operator may use as desired."  Def.'s FLSA MPSJ, #153, 14 (citing WWA, #148-1, Art. 2, § 1, ¶¶ 2f, 5a).  TriMet justifies this position based on federal regulations and case law concerning "waiting time," as opposed to periods during which the employee is "employed to perform their principal activity."  *Id.*  Such "waiting time" is non-compensable when an employee is "completely relieved from duty" and where "the time period is long enough to enable him to use the time effectively for his own purposes."  29 C.F.R. § 785.16(a).  This is distinguishable from periods in which employees are "engaged to wait" as an important aspect of their primary job.  29 C.F.R. § 785.15.

Plaintiffs argue that uncompensated Split-Shift Travel Time is not comparable to non-compensable waiting time.  Rather, Plaintiffs maintain that Split-Shift Travel Time is best characterized as a principal activity under the Portal to Portal Act, analogous to time spent by meat cutters donning and doffing protective gear and transferring between disparate work stations in a factory.  *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 28, 126 S. Ct. 514, 163 L. Ed. 2d 288 (2005).  Plaintiffs assert that *IBP, Inc. v. Alvarez* dealt with "precisely the issue posed by Split-Shift Travel Time" in this case, and found that any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the scope of the Portal to Portal Act's "principal activity" provisions and "as a result is covered by the FLSA."  *Id.* at 37.  Plaintiffs fail to acknowledge that *Alvarez* limited that holding to a "continuous workday" and did not consider extensive breaks of greater than one hour.  *Id.*  While *Alvarez* does anticipate limited time periods during which employees transfer from one station to another, which are loosely comparable to the less-than-one-hour duty

breaks for which MAX operators are compensated, *Alvarez* does not cover extensive break

periods.

The Tenth Circuit, in analyzing similar split-shift waiting periods, held that

> The undisputed evidence shows that most drivers had a three to five hour period in which they were free to do anything they chose except drink alcohol, knowing that they would 'not have to commence work until a definitely specified hour has arrived.' Most of them were able to 'use the time effectively for [their] own purposes' without restrictions. The fact that the split shift period is less convenient or less desirable than a straight shift does not mean that the drivers are on duty and deserving compensation during that shift; it simply means that their work schedule is not ideal. We therefore hold that the drivers' split shift periods are not hours worked under the FLSA.

*United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1118 (10th Cir. 1999)

(internal citations omitted). The court drew a distinction, however, between multiple-hour split-

shift waiting periods and split-shift travel time. The court explained

> [T]he City's basic argument about this shuttle time is that '[t]here is no meaningful distinction for FLSA purposes between split periods and travel time to and from split periods. In either case, the City claims, drivers are off duty, free to engage in personal pursuits. We disagree . . . .

> Indeed, we would, in essence, be holding that each shift is a principal activity in a separate workday, were we to hold that shuttle time to and from each shift is excluded as ordinary commuting time under the Portal–to–Portal Act. The regulations define "workday" under the Act as follows:

>> "Workday" . . . means . . . the period between the commencement and completion on the same workday of an employee's principal activity or activities. It includes all time within that period whether or not the employee engages in work throughout all of that period.

> 29 C.F.R. § 790.6. We agree with the district court that we should not turn a single 24–hour period into essentially two 24–hour periods, simply because the drivers drive two shifts separated by a

non-compensable off-duty period.

*City of Albuquerque*, 178 F.3d at 1119.  To counter this holding, which speaks to the precise

issue now before this court, TriMet argues that the Tenth Circuit only held that Split-Shift Travel

Time was compensable and not excluded as ordinary commuting time under the Portal to Portal

Act because the drivers in that case "were required to ride on the City's shuttles from the end

point of the first part of the shift to the starting point of the second part of the shift."  Def.'s

FLSA MPSJ Reply, #180, 12.  TriMet asks me to find no distinction between split-shift break

time, which is the time during extensive breaks that operators may use as they please, and Split-

Shift Travel Time, which is the time operators spend leaving the relief point at the beginning of

their split shift period or going to their relief point at the end of that period.  I cannot make that

finding on the record before me.  *See*, *e.g.*, *City of Albuquerque*, 178 F.3d at 1118.

The Tenth Circuit's reasoning is sound, and obligatory Split-Shift Travel Time during

which MAX operators must travel between two disparate geographical locations at the end of

one shift and prior to the beginning of another is not commute time under the Portal to Portal Act

and is therefore not inherently excluded from compensable hours under the FLSA.  TriMet's

FLSA MPSJ is therefore denied insofar as it applies to compulsory Split-Shift Travel Time that

takes place during split shifts that are longer than one hour.[7]

---

[7] TriMet further attacks the factual integrity of the evidentiary basis for Plaintiffs' claim
related to Split-Shift Travel Time.  Def.'s FLSA MPSJ Reply, #180, 10–11.  I remind TriMet
that, in evaluating the instant motion, I "must draw all reasonable inferences in favor of the
nonmoving party and may neither make credibility determinations nor perform any weighing of
the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 150.

### C.    Pre-Departure Time

#### 1.    Oregon Law

Pre-Departure Time, or the time operators "must spend at a relief location prior to making a relief," is not specifically discussed in the WWA.  TriMet argues that "an operator is not on duty until the time that he or she must begin operating a bus or MAX train."  Def.'s State Law MPSJ Reply, #161, 22-23.  TriMet fails, however, to provide any relevant provision of the WWA that supports that argument and ignores that the WWA expressly provides that operators may perform extra duties beyond transportation services.  WWA, #148-1, Art. 2, § 2, ¶ 2d.  TriMet also fails to acknowledge that Plaintiffs' allegations go beyond simply waiting at a bus or MAX stop at the start of a run and additionally assert that Plaintiffs are specifically instructed under a TriMet policy to arrive two buses or trains ahead of their scheduled run.  This gives rise to the reasonable inference that Plaintiffs' duties may begin before their scheduled run per TriMet's instructions, and I must draw that inference in the light most favorable to Plaintiffs.  *Reeves,* 530 U.S. at 150.

Thus, I find no evidence that the parties intended to define the compensability of Pre-Departure Time in the WWA, leaving that issue open.  Based on that fact, taken in conjunction with Plaintiffs' allegation that they are instructed to arrive two buses or trains ahead of their scheduled run, I deny TriMet's State Law MPSJ as it applies to Pre-Departure Time.

#### 2.    The FLSA

TriMet next moves against Plaintiffs' FLSA claim for Pre-Departure Time duties of MAX operators.  Def.'s FLSA MPSJ, #153, 15 (citing SAC, #18, ¶ 11, 35–36).  TriMet considers "Pre-Departure Time" equivalent to "waiting time" or time spent "waiting to be

engaged" under federal regulations and the Portal to Portal Act.  29 C.F.R. § 785.16(a).  Waiting

time is generally not compensable under the Portal to Portal Act when "the employee voluntarily

arrives at his place of employment earlier than he is either required or expected to arrive."  29

U.S.C. § 254(a)(2); 29 C.F.R. § 790.7(h).

Plaintiff responds to TriMet's arguments by contending that operators are told to report to

their work site two vehicles ahead of the vehicle they are expected to relieve.  Pl.'s FLSA MPSJ

Response, #166, 24.  Plaintiffs argue that determining when a "workday" begins should be

informed by 29 C.F.R. § 790.7, which provides that the determination hinges on when "an

employee is required to report at the actual place of performance of his principal activity."

Plaintiffs rely on the allegation that TriMet "has developed a policy and practice of instructing its

Operators making such reliefs to take a [train] that is at least two (2) [trains] ahead of the [train]

that would get such Operator to the relief point at the exact time of" relief."  Pl.'s FLSA MPSJ

Response, #166, 5, 25.

TriMet counters that MAX operators are under no such obligation and "[t]here's nothing

in [TriMet's] scheduling that says the operator has to be at the relief point ahead of that relief

time."  Zatarain Depo., Young Decl., #157, Ex. A, 85:14–18, 85:23–25.

In *Lindow v. United States*, 783 F.2d 1057 (9th Cir. 1984), the Ninth Circuit analyzed

whether employees were allowed to recover overtime for time spent each day in pre-shift

activities.  There, the court held that employees arrived early on their own accord and based on

custom, rather than out of any obligation from superiors.  783 F.2d at 1060.  However, there was

no evidence in *Lindow* indicating that superiors had instructed employees to arrive ahead of their

regularly scheduled work activities.  *See id.*  Here, Plaintiffs allege that MAX operators were

specifically instructed to arrive two trains ahead of their regularly scheduled run.  Pl.'s FLSA

MPSJ Response, #166, 5.  TriMet responds that allegations of "instructions," if any were even

given, are more fairly characterized as "advice" for MAX operators to arrive on time.  Inferences

drawn from this factual dispute, if any, must be drawn in a light most favorable to Plaintiffs.

There is a disputed factual question as to whether MAX operators were "engaged to wait"

by being instructed by superiors to arrive two trains early, resulting in Pre-Departure Time that

should be compensated pursuant to the FLSA.  This question is not addressed within the WWA,

nor does analysis of that agreement reveal the parties' intentions regarding this activity.

Accordingly, TriMet's FLSA MPSJ is denied as it applies to Pre-Departure Time.

### D.    Routinely Late Time

#### 1.    Oregon Law

Routinely Late Time, which is the difference between scheduled and actual run time, is

covered in the WWA under the description of conditions for which operators will be paid for

scheduled runs.  WWA, #148-1, Art. 2, § 1, ¶ 2b.  That section provides that "[o]perators shall be

paid for their regular scheduled runs, and shall not lose any time on account of . . . any conditions

over which they have no control . . . ."  *Id.*  Accordingly, TriMet offers, and evidence of record

shows that Plaintiffs employ, a Time Slip program to account for late bus arrivals and provide

operators with due compensation as described in the WWA.  Lomax Decl., #148, ¶¶ 21, 25–26;

Def.'s FLSA MPSJ, #153, 19.

Pursuant to the relevant standard, I analyze the evidence of Plaintiffs' compliance with

the Time Slip Program along with the evidence that the parties intended to define the

compensability for this category of work in their agreements.  *See Berry*, 30 F.3d at 1181.  Like

Start-End Travel Time, I find evidence that compensation for Routinely Late Time was anticipated within the WWA, bargained for by the parties, and accounted for under TriMet's Time Slip program, which is used by Plaintiffs based on evidence of record. For all of these reasons, TriMet's State Law MPSJ is granted as it applies to Routinely Late Time.

### 2. The FLSA

Regarding Routinely Late Time under the FLSA, TriMet argues the same points as it does under Oregon law, and offers evidence to show that MAX operators are in fact paid for Routinely Late Time through the Time Slip Program. Def.'s FLSA MPSJ, #153, 19.

MAX operators, including named Plaintiff Doug Tilson, complete Time Slips that indicate their badge number, the scheduled run number, and the amount of additional time worked in order to receive compensation for Routinely Late Time. *Id.* at 20 (providing examples of Time Slips). Plaintiffs counter that they have proffered significant evidence showing that Routinely Late Time occurs every day and results from TriMet's policies and practices related to route construction and scheduling. Plaintiffs also argue that TriMet has admitted to having actual knowledge that Routinely Late Time often goes uncompensated (primarily because operators fail to file requisite time slips). Pl.'s FLSA MPSJ Response, #166, 27.

In *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413 (9th Cir. 1981), the Ninth Circuit stated that an employer who is aware that employees are working overtime "cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for overtime compensation." 646 F.2d at 414. The employee in *Forrester* had, per an agreement with his employer, completed claims reports for overtime pay but also made claims for additional overtime hours for which he had not submitted

reports, similar to the Time Slips at issue in this case, on the basis that his employer had

knowledge or constructive knowledge that he had worked additional hours. *Id.* at 414. The

Ninth Circuit upheld a district court's grant of summary judgment in favor of the employer based

on the fact that the acts of the employee prevented the employer from acquiring knowledge of the

uncompensated overtime hours. *Id.* at 414. Similarly, where TriMet MAX operators are given

ample opportunity and instruction to fill out and provide Time Slips, and are encouraged to do so

rather than obstructed from doing so, any failure on behalf of MAX operators to provide TriMet

with a Time Slip deprives TriMet of the ability to properly compensate MAX operators for

Routinely Late Time, comparable to the outcome of *Forrester*.

  Plaintiffs assert a "policy-to-violate-the-policy" theory. Plaintiffs argue that it is the duty

of an employer to prevent employees from engaging in unauthorized work, such as overtime

worked when rules in place disallow it. *Mumbower v. Callicott*, 526 F.2d 1183 (8th Cir. 1975).

Plaintiffs maintain that the basic premise articulated in *Mumbower*, taken in conjunction with

TriMet's policy (1) to prohibit early operation of vehicles; (2) to schedule run times for durations

consistently less than a significant portion of actual run times, and (3) to fail to discipline

supervisors with knowledge of performance of unscheduled work, results in a "classic 'policy-to-

violate-the-policy.'" However, Plaintiffs do not provide persuasive precedent that, for the

purposes of this motion, indicates such a policy, even if it exists, has any bearing on the current

motion. Save for several decisions by district courts to deny motions to decertify classes, cases

cited by Plaintiffs do not provide any support for the premise that a "policy-to-violate-the-policy"

renders "Routinely Late Time" compensable under the FLSA. *See, e.g.*, *Mahoney v. Farmers*

*Ins.*, 2011 WL 4458513, at *9 (S.D. Tex. Sept. 23, 2011) (allowing class certification to proceed

where evidence showed that opt-in plaintiffs were put under "informal pressure not to request overtime, actual refusal to grant overtime, and explicit instructions . . . how to avoid detection of 'off-the-clock' work").

"An employer must have an opportunity to comply with the provisions of the FLSA." *Forrester*, 646 F.2d at 415. "[W]here the acts of an employee prevent an employer from acquiring knowledge . . . of uncompensated overtime hours," such as the failure to complete Time Slips according to common custom and practice by TriMet operators, including named Plaintiff Tilson, "the employer cannot be said to have suffered or permitted the employee to work in violation of [§] 207(a)" of the FLSA.  I find no question of material fact as to whether TriMet's policy allowing and encouraging operators to complete Time Slips for overtime worked complies with the FLSA or results in uncompensated Routinely Late Time in violation of the FLSA.  TriMet's FLSA MPSJ is therefore granted as it applies to Routinely Late Time.

### E.    Meeting Time

#### 1.    Oregon Law

As for Meeting Time, which Plaintiffs separately describe as time traveling from a relief location to the garage at which a compulsory meeting will be held, waiting time prior to meetings, and meetings regarding payroll corrections, I note preliminarily that the WWA only clearly provides compensation for educational programs related to safety and educational matters consistent with the regular rate of pay.  *See* WWA, #148-1, Art. 1, § 15, ¶ 2.  The WWA does not reflect negotiations related to compensation for any other compulsory meetings, nor does it either expressly or impliedly account for time expenditures associated with off-duty obligatory meetings—including travel from the end-point of scheduled runs to garages for meetings with

Page 32 - OPINION AND ORDER

supervisors as well as waiting time between the end of an operators' shift and a compulsory meeting. *See* Pl.'s Response to State Law MPSJ, #156, 4–5.

TriMet asks this court to "find that the WWA defines the circumstances under which TriMet is obligated to pay overtime" but nonetheless presents evidence showing that TriMet compensates operators for compulsory meetings (other than health and safety programs) in a manner not provided for in the WWA: the Time Slip Program, which is described above as it applies to Routinely Late Time. The Time Slip Program derives from the provision in the WWA stating that "[o]perators . . . shall not lose any time on account of . . . any conditions over which they have no control . . . ." *See* WWA, #148-1, Art. 2, § 1, ¶ 2b. I note that this extra-contractual compensation program actually contradicts TriMet's tacit position that the WWA reflects comprehensive overtime and compensation negotiations on all fronts, and it lends credence to the argument that the various obligatory time expenditures constituting Meeting Time were not anticipated or negotiated within the WWA. I find no evidence in the record to suggest that the Time Slip Program, although apparently often-used by operators for scheduled runs arriving late and some types of meetings, provides compensation for the various aspects of Meeting Time, described above. Thus, while I acknowledge that the WWA reflects that the parties have negotiated and agreed upon compensation for certain meetings under the Time Slip Program, it is unclear whether obligatory post-shift travel to meetings and waiting for meetings to begin, as well as meetings regarding payroll corrections, were negotiated by the parties or whether TriMet has simply arbitrarily refused to extend the Time Slip Program to compensate operators for that manner of Meeting Time.

Because Plaintiffs allege that TriMet does not compensate operators for Meeting Time, as

Page 33 - OPINION AND ORDER

it is described by Plaintiffs, and I find that the WWA is silent as to Meeting Time, I cannot

determine on the record before me whether Meeting Time is characterized as compensable work.

TriMet's State Law MPSJ is therefore denied as it applies to Meeting Time.

### 2.    The FLSA

TriMet next moves against Plaintiffs' FLSA claim regarding Meeting Time.  Def.'s FLSA

MPSJ, #153, 21 (citing SAC, #18, ¶ 13, 14, 35–36).  There appears to be no dispute whether

general obligatory meetings are compensable under the WWA or the Time Slip Program.  *See*

*id.*; Pl.'s FLSA MPSJ Response, #166, 30.  As described above in my analysis of Meeting Time

under Oregon law, Plaintiffs' instead take issue with TriMet's alleged policy and practice to not

compensate MAX operators for (1) time spent in meetings regarding payroll corrections, (2) off-

duty travel time to and from meetings that operators must attend with their supervisors, (3) time

spent by operators waiting between the end of their daily run assignment and the beginning of

meetings that operators must attend.  Pursuant to my analysis above, the WWA does not provide

evidence that the parties negotiated the various categories of Meeting Time that form the basis of

Plaintiffs' claims.  Without more, the compensability of Meeting Time is left to the applicable

definition of "work" supplied by the Supreme Court.  In its FLSA MPSJ, however, TriMet refers

to federal regulations and the Portal to Portal Act to cabin the compensability of Meeting Time in

the context of the FLSA.

In its Reply, TriMet argues that Plaintiffs have offered no support for their claim that

FLSA requires payment for (2) travel time to and from meetings, or (3) waiting time before a

meeting begins.  Def.'s FLSA MPSJ Reply, #180, 24.  For the reasons provided above regarding

Start-End Travel Time and Split-Shift Travel Time, *see, e.g.*, 29 C.F.R. § 785.16(a), and pursuant

to the Portal to Portal Act, I find that the portion of Meeting Time based around travel to

meetings and waiting for meetings to begin, which are postliminary activities and not time

associated with MAX operators' primary activity, is exempt from FLSA requirements. *See supra*

21–26. However, regarding (1) time spent in meetings for payroll corrections, I find insufficient

evidence on the record before me to find that such meetings are either compensable work time

pursuant to FLSA or, alternatively, whether such meetings do not fall within the scope of the

FLSA. *Compare* Pl.'s FLSA MPSJ Response, #166, 7 (merely stating that meetings for payroll

corrections are unpaid), *with* Yazzolino Depo., Young Decl., #157, Ex. D, 18:17–24 (scheduling

supervisor stating the following: "I don't take steps to compensate an operator when they talk to

payroll about a payroll issue," but failing indicate who initiates such meetings or whether such

meetings are ever obligatory).

    For these reasons, TriMet's FLSA MPSJ is granted in part as it applies to the travel and

waiting aspects of Meeting Time. TriMet's motion is denied, in part, however, as it applies to

meetings related to payroll corrections, as I find that there an unresolved question of material fact

as to whether such meetings are obligated by TriMet and therefore are compensable work under

the FLSA.

    **F.**    **Medical Examination Time**

        **1.**    **Oregon Law**

    Finally, TriMet moves against Medical Examination Time, which includes both the time

spent by operators in compulsory medical examinations and the time spent by operators pursuing

and receiving requisite medical certifications, and appears to be partly covered under the WWA

and partly not a duty at all. As an initial matter, I note that Plaintiffs offer no support, and I find

none, for the assertion that the activity involved in securing a license in order to operate a vehicle is compensable work time pursuant to ORS 653.268.

Plaintiffs further contend that, to the extent TriMet requires operators to undergo medical examinations while on duty or in connection with their duties, such time must be considered "work" under the applicable definition of ORS 653.268. Looking to the WWA, I find evidence that the parties have at least negotiated the existence of such examinations, as reflected by the provision therein that requires Trimet to "pay mileage . . . at the time [TriMet] requires the employee to go to [its] physician for . . . required evaluations (not to exceed 50 miles round-trip)." WWA, #148-1, Art. 1, § 19, ¶ 5. TriMet also requires medical examinations to be made promptly to avoid potential loss of pay to the employee. WWA, #148-1, Art. 1, § 19, ¶ 6. These provisions, taken together, provide a modicum of evidence that the parties negotiated compensation as it relates to medical examination time under the WWA, but does not resolve that issue. Notably, there is scant evidence in the record establishing how frequently TriMet requires operators to attend medical examinations during normal shifts, the duration of such examinations, clear parameters for the circumstances under which medical examinations are required, or the ordinary reasoning for the examinations. As stated above, the WWA is merely a factor in the compensability analysis, and is not conclusive on the issue of compensability. Without more, questions of fact exist as to whether required medical examinations may constitute compensable work subject to overtime.

For all of these reasons, TriMet's State Law MPSJ is granted in part as it applies to the licensing and certification aspect of Medical Examination Time and denied in part as it applies to Medical Examination Time related to compulsory medical examinations during the workday.

    2.    **The FLSA**

In analyzing TriMet's motion against Plaintiffs' FLSA claim regarding Medical

Examination Time as it applies to MAX operators, Def.'s FLSA MPSJ, #153, 24 (citing SAC,

#18, ¶ 15, 16, 35, and 36), I import my findings above that the WWA provides little evidence as

to the compensability of time expended in connection with medical examinations ordered by

TriMet during the workday. *See Owens*, 971 F.2d at 347; *Berry*, 30 F.3d at 1181; *Skidmore*, 323

U.S. at 137.

Regarding the licensing and certification aspect of Medical Examination Time, I note that

MAX operators must possess valid Commercial Drivers Licenses (CDL) as a condition of

employment. Additionally, MAX operators must possess a valid Department of Transportation

(DOT) Medical Card certifying physical qualification to operate a commercial vehicle. ORS

807.100. This requires MAX operators to undergo periodic medical examinations. TriMet's

standard operating procedure 015 ("SOP") highlights this requirement. Skillman Decl., #149,

Ex. 11, 1–17. TriMet maintains that MAX operators are not on duty when undergoing these

medical examinations, as they are performed outside the operators' principal activity, and

therefore outside the scope of the FLSA. 29 U.S.C. § 254(a)(2). I agree.

Plaintiffs point the court to an array of Department of Labor Opinion Letters,

jurisprudence regarding counseling and psychiatric sessions, and protocol for compensation of

medical requirements imposed on federal employees. *See* Pl.'s FLSA MPSJ Response, #166,

30–31 (citing *Sehie v. City of Aurora*, 734 F.3d 749, 752 (7th Cir. 2005); *Required Physical*

*Examination/Hours Worked*, Wages & Hours Manual (BNA), U.S. Dept. of Labor (Oct. 7,

1997)). Plaintiffs ask the court to give the Department of Labor "considerable deference" and,

presumably, interpret its guidance letters as placing an obligation upon TriMet to compensate its employees for hours spent in medical examinations related to necessary licensing.

TriMet argues, and I agree, that the opinion letters referred to by Plaintiffs "do not warrant *Chevron*-style deference," as explained by the Seventh Circuit in *Sehie.*  734 F.3d at 753. I find no basis under the FLSA for declaring that an employer must necessarily compensate its workers for medical examinations associated with common licensing requirements imposed upon employees.

For these reasons, I find no question of material fact as to whether TriMet violates the FLSA by way of its policy not to compensate MAX operators for medical requirements associated with required CDLs and DOT Medical Cards.  TriMet's FLSA MPSJ is therefore granted in part as it applies to that aspect of Medical Examination Time.  For the reasons provided above under my analysis of Medical Examination Time under Oregon law, however, TriMet's FLSA MPSJ is denied in part as it applies to the aspect of Medical Examination Time related to compulsory examinations during the workday.

## CONCLUSION

For the reasons set forth above, TriMet's Motion for Partial Summary Judgment as to All State Law Claims (#146) is denied in part as it applies to Split-Shift Travel Time, Pre-Departure Time, Meeting Time, and Medical Examination Time related to compulsory examinations during the workday.  TriMet's Motion is granted in part as it applies to Start-End Travel Time, Routinely Late Time, and the licensing and certification aspect of Medical Examination Time.

TriMet's Motion for Partial Summary Judgment as to MAX Operators' FLSA Claims (#153) is denied in part as it applies to Split-Shift Travel Time, Pre-Departure Time, the category

of Meeting Time related to payroll corrections, and Medical Examination Time related to

compulsory examinations during the workday.  TriMet's Motion is granted in part as it applies to

Start-End Travel Time, Routinely Late Time, the categories of Meeting Time related to travel

and waiting, , and the licensing and certification aspect of Medical Examination Time.

Finally, TriMet's Motion to Strike (#189) is denied as moot.

IT IS SO ORDERED.

Dated this 30th day of June, 2015.


 /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge

Page 39 - OPINION AND ORDER